UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN A. PETRUCELLI,           )
                              )
         Plaintiff,           )
                              )        Civil Action No. 18-729 (CKK)
              v.              )
                              )
DEPARTMENT OF JUSTICE,        )
                              )
         Defendant.           )
_____)

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants U.S. Department

of Justice ("DOJ"), the Federal Bureau of Prisons ("BOP"), and the Executive Office for United

States Attorneys ("EOUSA")[1] respectfully move for summary judgment in their favor. In support

of this motion, Defendants submit the attached memorandum of law, statement of material facts,

and agency declarations and the exhibits thereto. Also attached is a proposed order.

Dated: June 17, 2019             Respectfully submitted,

                                 JESSIE K. LIU, D.C. Bar No. 472845
                                 United States Attorney

                                 DANIEL F. VAN HORN,     D.C. Bar No. 924092
                                 Chief, Civil Division

                          By:     /s/  Scott Leeson Sroka
                                 SCOTT LEESON SROKA, Member of New York Bar
                                 Assistant United States Attorney
                                 555 Fourth Street, N.W.
                                 Washington, D.C. 20530
                                 (202) 252-7113
                                 Scott.Sroka@usdoj.gov

                                 *Attorneys for Defendants*

---

[1] BOP and EOUSA are subcomponents of DOJ.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN A. PETRUCELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 18-729 (CKK) |
| v. | ) | |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case arises from Plaintiff's Freedom of Information Act ("FOIA") requests directed to BOP and EOUSA. Defendants have reasonably complied with the requests for records submitted by Plaintiff under FOIA. Having completed their search for responsive records subject to FOIA and released all nonexempt information, Defendants respectfully move the Court to grant summary judgment, pursuant to Rule 56(a), on all of Plaintiff's claims.

**STATEMENT OF FACTS**

Defendants incorporate herein the attached Defendants' Statement of Material Facts to Which There is No Genuine Issue.

**PROCEDURAL BACKGROUND**

For all relevant time periods, Plaintiff has been an inmate at a BOP facility. On February 2, 2018, Plaintiff filed his initial Complaint (ECF No. 1) pursuant to the Freedom of Information Act ("FOIA") based upon requests he had made to BOP and EOUSA. On May 23, 2018, Plaintiff filed a Supplemental Memorandum (ECF No. 7) and asked the Court to supplement the original Complaint. Defendants answered all of Plaintiff's allegations on June 25, 2018 (ECF No. 8). On August 2, 2018, the Court issued an Order (ECF No. 13) setting a briefing schedule.

On October 9, 2018, Plaintiff moved to file a Second Amended Complaint (ECF Nos. 14, 17). On October 15, 2018, the Court granted Plaintiff's motion (ECF No. 16). On October 23, 2018, Defendants answered the Second Amended Complaint (ECF No. 18).

## STANDARDS OF REVIEW

### I.     Motion for Summary Judgment Under Rule 56

Under Rule 56 of the Federal Rules of Civil Procedure ("Rules"), a court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### II.    Discharge of FOIA Obligations

"FOIA cases are typically and appropriately decided on motions for summary judgment." *Ryan v. FBI*, 174 F. Supp. 3d 486, 490 (D.D.C. 2016) (internal quotation marks omitted).  "When an agency moves for summary judgment on the grounds that it has discharged its FOIA obligations, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester, and only after the agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate." *Id.*

"An agency will be granted summary judgment on the adequacy of its search if it 'show[s] beyond material doubt [ ] that it has conducted a search reasonably calculated to uncover all relevant documents.'" *Id.*  "Adequacy 'is judged by a standard of reasonableness and depends, not surprisingly, on the facts of each case.'" *Id.*  "[A] search may be reasonable if it includes all systems 'that are likely to turn up the information requested.'" *Id.* at 490-91.

"To meet its burden and show adequacy, 'the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Id*. at 491. "These declarations are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.* (internal quotation marks omitted). "An agency can show reasonableness in its affidavit by setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* (internal quotation marks omitted).

"The agency need not search every record in the system or conduct a perfect search." *Judicial Watch, Inc. v. U.S. Dep't of the Treasury*, Civ. A. No. 15-1776 (RMC), 2017 WL 1207414, at *2 (D.D.C. Mar. 31, 2017). "[T]he fact that a particular document was not found does not demonstrate the inadequacy of a search." *Andrews v. Dep't of Justice*, 212 F. Supp. 3d 109, 113 (D.D.C. 2015) (internal quotation marks omitted). Also, "the [m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." *Id.* (internal quotation marks omitted).

## ARGUMENT

Defendants have appropriately searched for and provided records responsive to the requests at issue, subject to the withholding of certain information pursuant to the applicable FOIA Exemptions. They have disclosed all reasonably segregable information.

## I.   DEFENDANTS COMPLIED WITH THEIR OBLIGATION TO SEARCH FOR RESPONSIVE INFORMATION.

FOIA requires that an agency release all records responsive to a properly submitted request unless such records are protected from disclosure by one of more of the Act's nine exemptions. 5 U.S.C. § 552(b); *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150-51 (1989). Once the court determines that an agency has released all non-exempt material, it has no further judicial

function to perform under FOIA and the FOIA claim is moot. *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982), *Muhammad v. U.S. Customs & Border Prot.*, 559 F. Supp. 2d 5, 7-8 (D.D.C. 2008). Here, Defendants conducted appropriate searches and released responsive records, subject to appropriate withholdings permitted under FOIA.

Under FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). A search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs. Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see Judicial Watch v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (noting that "[p]erfection is not the standard by which the reasonableness of a FOIA search is measured"). It is appropriate for an agency to search for responsive records in accordance with the manner in which its records systems are indexed. *Greenberg v. Department of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

**A.      BOP and EOUSA Conducted Adequate Searches for Responsive Records.**

**1. <u>BOP</u>**

a. <u>BOP's Systems of Records and Databases</u>

After receiving Plaintiff's FOIA requests, DOJ undertook a search for responsive documents in the BOP databases and systems most likely to contain responsive records. BOP's Inmate Central Records System is among the most frequently requested systems and are most likely to render responsive records. Declaration of Michelle Wirth ("Wirth Decl.") ¶¶ 4-6; Declaration of Lee-Anne Eichensehr ("Eichensehr Decl.") ¶¶ 7-9. The Inmate Central Records System is essentially an inmate's "Central File." In order to effectively manage the inmate population, BOP collects information regarding an inmate in a Central File that is maintained at the inmate's current or last institution of confinement if the inmate has been released from BOP custody. An inmate's Central File is divided into six sections: (1) Sentence Data/Detainers/Inmate

Financial Responsibility Program; (2) Classification/Parole Material; (3) Mail, Visits, and Property, etc.; (4) Conduct, Work, and Quarters Reports; (5) Release Processing; and (6) General Correspondence. Wirth Decl. ¶ 7; Eichensehr Decl. ¶ 10.

Documents maintained in an inmate's Central File include – but are not limited to – his Judgment and Commitment Order, Presentence Investigation Report, sentence computation documents, Transfer Orders (BP-399), Requests for Transfer, Requests for Management Variables, custody classifications, approved visiting lists, Discipline Hearing Officer Packets, and Inmate Requests to Staff. An inmate has the option to look at and make copies of the majority of his Central File materials. This procedure is not required by either FOIA or the Privacy Act, but is in accordance with sound correctional practices. Only FOIA exempt materials are unavailable for this local review. A similar procedure allows inmates to access their medical records at the local level. Wirth Decl. ¶ 8; Eichensehr Decl. ¶¶ 11-12.

Here, BOP's search was reasonable because it properly determined where responsive records were likely to be found and searched those locations. *See McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 849 F. Supp. 2d 47, 55-56 (D.D.C. 2012) (concluding that agency's search was reasonable because agency determined that all responsive records were located in particular location created for express purpose of collecting records related to subject of request and searched that location); *James Madison Project v. CIA*, 605 F. Supp. 2d 99, 108 (D.D.C. 2009) (concluding that "search method could  reasonably be expected to produce the information requested" because all agency regulations requested were maintained in one records system and agency searched that system for responsive records); *Brehm v. DOD*, 593 F. Supp. 2d 49, 50 (D.D.C. 2009) (finding search was adequate where agency searched two systems likely to have responsive records and where agency also declared other systems were unlikely to have responsive records).

b. <u>Plaintiff's Complaint (ECF No. 1) and Supplemental Memorandum (ECF No. 7)</u>

On March 7, 2016, BOP received Plaintiff's FOIA request that was logged as request number 2016-03369. Plaintiff requested "[a]ny and all information in which your agency ma[y] have records of my name John Petrucelli which may be mixed up as part of a routine investigation with DOJ employees." Wirth Decl. ¶ 10 and Ex. A. On August 8, 2016, BOP released to Plaintiff 245 pages of responsive records. Nine pages were released in full, 87 pages were released in part, and 149 pages were withheld in full. These records were from the FOIA-Exempt Privacy Folder of Plaintiff's Central File. BOP made withholdings pursuant to FOIA Exemptions 6, 7(C), and 7(F). *Id.* and Ex. B.

On December 8, 2016, following discussions between the Office of Information Policy ("OIP") and BOP, BOP released the full remainder of the records in Plaintiff's Central File, which amounted to 261 pages of responsive records. This supplemental release was performed under request number 2017-00843. Fifty of these pages were released in full, 193 pages were released in part, and 18 pages were withheld in full pursuant to Exemptions 6, 7(C), and 7(F). *Id.* and Ex. C.

In a letter dated January 18, 2017, OIP granted administrative relief on Plaintiff's appeal of BOP Request number 2016-03369. OIP remanded the request "for further processing of one page of responsive records." OIP otherwise affirmed BOP's application of the exemptions and further determined that BOP had conducted an adequate search following the supplemental release performed under request number 2017-00843. *Id.* and Ex. D. In response to the remand, BOP opened request number 2017-02392, reprocessed the one page of records in accordance with the remand, and released the record to Plaintiff in a letter dated January 27, 2017. Exempt information was withheld pursuant to Exemptions 6 and 7(C). *Id.* and Ex. E.

In a letter dated April 6, 2017, OIP again granted administrative relief, but this time regarding the supplemental release under request number 2017-00843. OIP remanded the request "for further processing of two responsive records." OIP otherwise affirmed BOP's application of exemptions and determined that BOP had conducted an adequate, reasonable search. *Id.* and Ex. F. In a letter dated June 11, 2018, under request number 2017-03853, BOP located, reprocessed, and released the pages remanded by OIP. BOP noted that the roughly 14-month delay in responding to the remand was because of an administrative error. *Id.* and Ex. G. On September 26, 2018, non-exempt or segregable material was released on 47 pages of the total already released to Plaintiff in 2016-03369, 2017-00843, 2017-02392, and 2017-03853. Following this release, all responsive, non-exempt, and segregable information was released to Plaintiff. *Id.* and Exs. H and I.

If Plaintiff's Complaint (ECF No. 1) and Supplemental Complaint (ECF No. 7) are liberally construed, they allege that (1) BOP improperly construed Plaintiff's search terms; (2) BOP failed to comply with an OIP remand to disclose two pages; (3) BOP improperly applied the FOIA exemptions; and (4) BOP's search was inadequate. *Id.* ¶ 12. Regarding the search terms, Plaintiff contends that BOP improperly "changed the search request from 'Any DOJ employee who could be mixed up in the investigation with John Petrucelli,' to 'All information about John Petrucelli.'" Compl. ¶ 11. As noted above, the actual request states, "[a]ny and all information in which your agency ma[y] have records of my name John Petrucelli which may be mixed up as part of a routine investigation with DOJ employees." BOP liberally construes request language, particularly when a requester is proceeding *pro se*. *Id.* ¶ 13 and Ex. A.

When an inmate requests records about himself or lists his name as the sole search term, it is the practice of BOP to construe this as a request for that inmate's Central File, including the

FOIA-Exempt Privacy Folder. This is because the Central File is the comprehensive record that is most likely to render responsive documents. The August 8, 2016, BOP initial response letter describes the search in terms that match Plaintiff's request language. *Id.* ¶ 14 and Ex. B. OIP used the shorthand phrases "request for access to records concerning yourself" and "certain information concerning yourself" in appeal letters. *See id.* and Exs. D, F, and H. This may be the source of Plaintiff's allegation. It is submitted that BOP did not improperly narrow the scope of Plaintiff's request language. This conclusion is supported by a statement from Plaintiff's Supplemental Complaint, which states, "Plaintiff Is A Pro Se Litigant Who Is Only Trying To Obtain Information *About Himself* That He Believes Has Been Improperly Withheld." Supp. Compl. at 2-3 (emphasis added); Wirth Decl. ¶ 14. In the absence of any other parameters, BOP's search of Plaintiff's Central File for records concerning "the name John Petrucelli" was reasonably calculated to produce responsive records. Wirth Decl. ¶ 14.

   i. BOP's Delayed Compliance with OIP's Remand

   Plaintiff is incorrect in his claim that BOP failed to disclose two pages of records in response to an OIP remand. The release was late. At the time Plaintiff filed his Complaint, BOP had not complied with the OIP remand in case number DOJ-AP-2017-001564. Wirth Decl. ¶ 15 and Ex. F. The remand was not acted upon promptly because of an administrative error. Nevertheless, BOP corrected the error in a letter dated June 11, 2018, under request number 2017-03853. BOP located and released the pages remanded by OIP with the relevant redactions removed. *Id.* and Ex. G. Justification for the exemptions used following remand are provided in Exhibit H at 152-53.

ii. <u>Search and Processing</u>

An inmate's Central File is in paper format, and it is generally maintained at the inmate's current institution. The files are stored alphabetically by inmate name in secure fireproof cabinets in the unit team offices of the housing unit where the inmate lives. During this litigation, Plaintiff has been housed at FCI Allenwood in White Deer, Pennsylvania. Wirth Decl. ¶ 16. BOP's Northeast Regional Office ("NERO") received Plaintiff's FOIA request on March 24, 2016, and on the same day forwarded, by e-mail, a request for documents to FCI Allenwood. In that request, Plaintiff asked for "[a]ny and all information in which your agency ma[y] have records of my name John Petrucelli which may be mixed up as part of a routine investigation with DOJ employees." *Id.* ¶ 17 and Ex. A. BOP personnel opened the e-mail, read the request, and determined that the request should be construed as a request for the Privacy Folder (also known as the FOIA-Exempt Section) of Plaintiff's Central File. This determination was based on the fact that Plaintiff could review the remainder of the Central File in unredacted form through local review procedures. *Id.* ¶ 18.

On March 24, 2016, BOP sent the request for documents to the Unit Manager to obtain the FOIA-exempt records from Plaintiff's Central File. The Unit Secretary for Plaintiff's unit conducted the search for Plaintiff's file. Upon reviewing Plaintiff's Central File, the Secretary located 245 pages of potentially responsive documents. These records were forwarded to a BOP FOIA Paralegal Specialist on March 28, 2016. On July 19, 2016, BOP began processing the responsive documents. On or about August 8, 2016, BOP sent a determination letter to Plaintiff. The letter stated BOP's initial conclusion that nine pages were appropriate for release in full; 87 pages were appropriate for release in part, and 149 pages were withheld in their entirety. *Id.* ¶ 19 and Ex. B.

On November 4, 2016, OIP directed that all sections of Plaintiff's Central File be searched and processed, not just the FOIA Exempt section. On November 8, 2016, BOP sent a request for documents to the Case Manager to obtain Plaintiff's remaining Central File records. The Case Manager for Plaintiff's unit conducted the search for Plaintiff's file. Upon reviewing Plaintiff's Central File, the Case Manager located 261 pages of potentially responsive documents. Those records were forwarded to the FOIA Paralegal Specialist on November 8, 2016. On November 15, 2016, BOP began processing the responsive documents. On or about December 8, 2016, BOP sent a determination letter to Plaintiff stating BOP's conclusion that 50 pages were appropriate to release in full; 193 pages were appropriate to release in part; and 18 pages were withheld in their entirety. *Id.* ¶ 20 and Ex. C.

In a remand letter dated January 18, 2017, OIP ordered BOP to reprocess one page withheld in full to be withheld only in part to release Plaintiff's full name. OIP otherwise affirmed BOP's action on this request. *Id.* ¶ 21 and Ex. D. On January 26, 2017, another processor began processing the remanded document. On or about January 27, 2017, BOP sent a determination letter to Plaintiff stating that one page was appropriate for release in part. *Id.* ¶ 22 and Ex. E. This document was further segregated in anticipation of litigation. *Id.* and Exs. H and I.

On April 6, 2017, OIP remanded BOP request number 2017-00843 for further processing of two pages of responsive records. Otherwise, OIP affirmed BOP's action on 2017-00843. *Id.* ¶ 23 and Ex. F. On April 10, 2017, BOP began processing the two pages of remanded documents and prepared the determination letter. It was sent to NERO for review the same day. Because of an administrative error, the two pages were not released to Plaintiff until June 11, 2018, after the filing of this lawsuit. *Id.* ¶ 24 and Ex. G.

BOP conducted an adequate search once Plaintiff's entire Central File was gathered for processing. The initial search, under 2016-03369, for only the FOIA-exempt Privacy Folder from the Central File was admittedly too narrow and therefore inadequate. *See id.* ¶ 25 and Ex. B. Nonetheless, the error was cured when BOP made a supplemental release of the remainder of Plaintiff's Central File in 2017-00843. *Id.* and Ex. C. At that point, with Plaintiff's search parameters, there was no other location to be searched that was reasonably likely to render responsive documents. Wirth Decl. ¶ 25.

c. Plaintiff's Second Amended Complaint (ECF No. 17)

On August 10, 2018, BOP received Plaintiff's FOIA request that was logged as request number 2018—6810 ("FCI Manchester Matters"). Plaintiff requested records from 2010-2012, a time when he was incarcerated at FCI Manchester. BOP searched but found no records responsive to this four-part request. BOP mailed Plaintiff a final determination letter on September 5, 2018. Eichensehr Decl. ¶ 5 and Ex. A.

Also on August 10, 2018, BOP received from Plaintiff FOIA request number 2018-06812 ("2002 New York Fight"). Plaintiff asked for records concerning an altercation he was involved in at MCC New York in 2002. On May 9, 2019, BOP mailed Plaintiff a final determination letter that released five pages of responsive documents. One page was released in full, and four pages were redacted in part. *Id.* and Ex. B.

On August 13, 2018, Plaintiff filed BOP FOIA request number 2018-06820 ("Canaan to Manchester Transfer"). He sought any and all records concerning his transfer from USP Canaan to FCI Manchester in June 2010. On December 10, 2018, BOP released two pages of documents that were redacted in part. *Id.* and Ex. C.

On August 17, 2018, Plaintiff filed request number 2018-06906 ("Manchester to Allenwood Transfer"), seeking any and all records concerning his transfer from FCI Manchester to FCI Allenwood in May 2012. Plaintiff also asked for records that would show why he was not transferred to FCI McKean. On October 11, 2018, BOP released two pages of records that were redacted in part. On November 9, 2018, Plaintiff filed an appeal with OIP. In the wake of discussions between OIP and NERO FOIA, OIP remanded the request for further searching. BOP found an additional eight pages of responsive records. Under new request number 2019-03001, three of these pages were released in full, and five pages were released in part. *Id.* and Ex. D.

On August 27, 2018, Plaintiff filed request number 2018-07118 ("2011 FOIA Denial"), seeking a copy of a final FOIA determination letter that he believed he received from the Mid-Atlantic Regional Office ("MARO") of BOP. On August 31, 2018, BOP released one page in full, a letter from a 2010 NERO FOIA request. *Id.* and Ex. E.

Also on August 27, 2018, Plaintiff filed FOIA request number 2018-07116 ("2002 Intake Screening"), seeking records concerning a January 2002 intake screening at MDC Brooklyn. On April 5, 2019, BOP released three pages of records, one in full and two in part. *Id.* and Ex. F.

On August 27, 2018, Plaintiff filed FOIA request number 2018-07115 ("Brooklyn Cell Assignment"), seeking records regarding a cell or cells he spent two or three days in at MDC Brooklyn. On September 24, 2018, BOP released two partially redacted pages to Plaintiff. *Id.* and Ex. G.

i. Search and Processing

*FCI Manchester Matters, 2018-06810*

The NERO received the FCI Manchester Matters request on August 15, 2018, and on the same date forwarded a request for documents to FCI Allenwood and FCI Manchester. In the

request, Plaintiff sought "[a]ny and all information about himself where he and some employees of DOJ could be mixed up in an investigation." *Id.*, Ex. A. Plaintiff specifically stated that he was housed in Manchester, Kentucky in or about 2010-2012, where he had difficulty with staff and believed he was being targeted. Within those parameters, Plaintiff asked for: (1) information concerning a charge that he had a weapon in his cell and was given extra duty; (2) information concerning his family's contact with BOP's Office of Internal Affairs ("OIA"); (3) records concerning a complaint he filed that resulted in a meeting with SIS and a transfer; and (4) records of steps he took pursuant to BOP Program Statement 1210.21, <u>Boards of Inquiry and Inquiry Teams</u> (3/9/2000). *Id.* ¶ 16.

On August 15, 2018, the Warden's Secretary at FCI Manchester reported that there were no responsive records located at FCI Manchester. On August 27, 2018, the FCI Allenwood case manager reported that no records were located in the Central File. The case manager determined that Plaintiff was never sanctioned by the unit discipline committee or the disciplinary hearing officer. On August 29, 2018, an additional request was made to search for records in the SIS Department of FCI Manchester and to BOP's OIA in Washington, D.C. A "no records" response was received from OIA on August 29, 2018. A "no records" response was received on September 5, 2018, from FCI Manchester. The SIS department responded to the e-mail search query by reporting that a steel rod was found in Plaintiff's locker on February 12, 2012, but no incident report was written, and Plaintiff was never charged with possession of a weapon. At this point, BOP had searched all areas reasonably likely to render records responsive to Plaintiff's request concerning the FCI Manchester Matters. No other areas remained to be searched that were reasonably likely to render responsive documents. A final determination letter was sent to Plaintiff on September 5, 2018. *Id.* ¶ 17.

*The 2002 New York Fight, 2018-06812*

The NERO received Plaintiff's FOIA request on August 15, 2018, and on the same date forwarded, via e-mail, a request for documents to FCI Allenwood. In the request, Plaintiff sought "[a]ny and all information pertaining to himself being involved in an altercation with another inmate while being housed at MCC New York in 2002." Plaintiff stated that he had "filed some internal and administrative appeals with the incident[ ] while in the S.H.U. at MCC New York." *Id.* ¶ 18 and Ex. B.

On August 20, 2018, BOP received a "no records" response from the case manager at FCI Allenwood, who indicated that Plaintiff was sanctioned in 2002 for "assault with serious injury." The case manager conducted a search of Plaintiff's central file and was unable to locate the incident report. *Id.* ¶ 19.

On December 6, 2018, BOP e-mailed a request for documents to MCC New York and received no response. On April 5, 2019, BOP e-mailed MCC New York an additional request for documents. On the same date, MCC New York responded that they were searching institution files and archives for responsive records. MCC New York advised that the incident report regarding the fight and Plaintiff's administrative appeal of the incident should be in Plaintff's central file. On April 9, 2019, BOP e-mailed the unit secretary at FCI Allenwood to ask her to conduct an additional search of the same central file for the 2002 incident report. BOP also asked her to search Plaintiff's cop-outs to staff to see if he had made any requests regarding the incident. On April 9, 2019, the unit secretary conducted a search of Plaintiff's central file and located the 2002 incident report and forwarded it to BOP. The secretary reported there were no cop-outs in the file that referenced the 2002 incident. *Id.* ¶ 20.

On April 9, 2019, BOP e-mailed the NERO Administrative Remedy section to see if they could locate the BP-10 Plaintiff referenced in his request and is reflected in SENTRY. On April 10, 2019, NERO found the BP-10 and forwarded it to BOP for processing. *Id.* ¶ 21.

On April 22, 2019, BOP reported to MCC New York that copies of the incident report and the BP-10 had been recovered. BOP determined that anything else that might be responsive would be irregular or exotic, *i.e.*, outside the normal systems-of-records expectations. BOP requested a status report on the New York search. On May 5, 2019, in response to a telephone query, MCC New York reported that a search of local SIS files recovered nothing responsive to the request. BOP requested MCC New York to stop their searches because it was not reasonably likely that an archive search would render responsive documents. The "internal" appeal, if it exists, would have been recovered during FCI Allenwood's April 9, 2019, search of Plaintiff's cop-outs. *Id.* ¶ 22.

At this point, BOP had searched all areas reasonably likely to render records responsive to Plaintiff's request concerning the 2002 New York Fight. No other areas remained to be searched that were reasonably likely to render responsive documents. Therefore, BOP began processing the records on May 7, 2019. On May 9, 2019, five pages of responsive records were released to Plaintiff. *Id.* ¶ 23.

*The Canaan to Manchester Transfer, 2018-06820*

The NERO received Plaintiff's FOIA request regarding this transfer on August 13, 2018. On the same date, BOP forwarded, via e-mail, a request for documents to FCI Allenwood. In the request, Plaintiff sought any and all information pertaining to his transfer to FCI Manchester. Plaintiff detailed his move from USP Canaan, the multiple holdover locations where he stayed on the transfer, the travel conditions, and a loss of his personal property. *Id.* ¶ 24 and Ex. C.

Plaintiff's case manager at FCI Allenwood conducted a search of Plaintiff's central file and located one page of responsive records, which was forwarded to BOP for processing on August 27, 2018. *Id.* ¶ 25.

On December 6, 2018, BOP sent a request for documents to the e-mailbox of the DSCC Attorney at Grand Prairie, Texas. On December 10, 2018, a DSCC paralegal located one page of responsive records, which was forwarded to BOP for processing. At this point, BOP had searched all areas reasonably likely to render records responsive to Plaintiff's request concerning the Canaan to Manchester Transfer. No other areas remained to be searched that were reasonably likely to render responsive documents. Therefore, BOP began processing the records. On December 11, 2018, the records were mailed to Plaintiff and the request was closed. *Id.* ¶ 26 and Ex. C.

*The Manchester to Allenwood Transfer, 2018-06906*

The NERO received Plaintiff's FOIA request regarding this transfer on August 17, 2018. On the same date, BOP sent a request for documents to FCI Allenwood. In the request, Plaintiff sought records about himself that involved his transfer in or about May 2012. Plaintiff detailed his experience, including his belief that he was being transferred to FCI McKean and that he lost property. *Id.* ¶ 27 and Ex. D.

On August 27, 2018, the case manager at FCI Allenwood conducted a search of Plaintiff's central file. No record related to the transfer from FCI Manchester to FCI Allenwood was located in the central file. On September 20, 2018, BOP sent request for documents to the DSCC Attorney mailbox. On September 27, 2018, a DSCC paralegal located one responsive record, which was sent to BOP for processing. On October 5, 2018, BOP e-mailed the paralegal for additional information as to why Plaintiff's transfer destination was changed from FCI McKean to FCI Allenwood. On December 10, 2018, DSCC responded that Plaintiff's transfer destination was

changed due to his CIMs assignment of separation, and advised that certain SENTRY transactions would render separation information. However, BOP did not search further because BOP concluded that the separation records were beyond the scope of the request and therefore nonresponsive. At this point, BOP had searched all areas reasonably likely to render records responsive to Plaintiff's request concerning the Manchester to Allenwood Transfer. It appeared that no other areas remained to be searched that were reasonably likely to render responsive documents. Therefore, BOP processed the records and approved the release on October 25, 2018, which was mailed to Plaintiff. The request was closed on October 29, 2018. *Id.* ¶ 28.

On February 13, 2019, OIP reported that Plaintiff was challenging the search as well as the FOIA exemptions applied to this request. BOP reviewed the request to determine if an additional search should be conducted. On February 13, 2019, the records department at FCI Allenwood produced a three-page SENTRY record concerning CIM Clearance and Separatee Data. BOP also contacted Plaintiff's unit manager to request an additional search of the central file for responsive transfer records that may have been missed in the initial search. The Unit Manager conducted the search of the central file and located two property sheets. The first property sheet, which was completed on July 31, 2012, showed that Plaintiff noted missing property. The notation was lined through and initialed by staff. The second property sheet was dated August 16, 2012, in which Plaintiff did not mention any missing property. *Id.* ¶ 29 and Ex. D.

On March 26, 2019, the request was remanded for processing of the additional documents. BOP processed the additional documents and assigned the request for review on March 29, 2019. The request was approved and the records were mailed to Plaintiff on April 2, 2019. *Id.* ¶ 30 and Ex. D.

*The 2011 FOIA Denial, 2018-07118*

The NERO received Plaintiff's FOIA request on August 27, 2018, and on the same date BOP conducted a search of 2011 FOIA requests using Plaintiff's name and register number as the search criteria. In the request, Plaintiff sought a copy of the FOIA determination letter pertaining to a copy of an administrative detention order from 2002. On August 30, 2018, BOP located the requested record in one of its FOIA databases. At this point, BOP had searched all areas reasonably likely to render records responsive to Plaintiff's request concerning the 2011 FOIA Denial Letter. No other areas remained to be searched that were reasonably likely to render responsive documents. Therefore, BOP began processing the record, the request was approved, and the records were sent to Plaintiff on August 31, 2018. *Id.* ¶ 31 and Ex. E.

*The 2002 Intake Screening, 2018-07116*

The NERO received Plaintiff's FOIA request on August 27, 2018, and on the same date forwarded, via e-mail, a request for documents to FCI Allenwood. In the request, Plaintiff sought a copy of the intake screening completed by a senior officer specialist in 2002. On September 7, 2018, a case manager at FCI Allenwood forwarded two pages of responsive records which were uploaded to the FOIA database. *Id.* ¶ 32 and Ex. F.

On April 5, 2018, BOP conducted a new search and contacted Plaintiff's correctional counselor at FCI Allenwood and requested the counselor to conduct a second search of the central file for any records regarding the 2002 intake screening. The counselor conducted the search of the central file and located one page of additional records that BOP considered responsive to the request. At this point, BOP had searched all areas reasonably likely to render records responsive to Plaintiff's request concerning the 2002 Intake Screening. No other areas remained to be searched that were reasonably likely to render responsive documents. BOP processed three pages of records

18

and referred the matter for secondary review on April 5, 2019. That same day, the release was approved and mailed to Plaintiff. *Id.* ¶ 33.

*The 2002 Brooklyn Cell Assignment, 2018-07115*

The NERO received this FOIA request on August 30, 2018, and on the same date BOP reviewed FOIA #2017-00843, which Plaintiff mentioned regarding the Brooklyn Cell Assignment. BOP conducted a SENTRY search of Plaintiff's history of housing quarters to determine which records could possibly be missing from FOIA #2017-00843. In the request, Plaintiff sought missing SHU records from two or three days in 2002 at MDC Brooklyn. *Id.* ¶ 34 and Ex. G.

On August 30, 2018, BOP sent a request for documents to FCI Allenwood to conduct a search of the central file for the SHU records that might be missing. On September 6, 2018, an FCI Allenwood case manager sent BOP two pages of records. At this point, BOP had searched all areas reasonably likely to render records responsive to Plaintiff's request concerning the Brooklyn Cell Assignment. No other areas remained to be searched that were reasonably likely to render responsive documents. Therefore, BOP processed the records, which were mailed to Plaintiff on September 24, 2018. *Id.* ¶ 35.

## 2. EOUSA

Plaintiff submitted a FOIA request dated October 27, 2016, to EOUSA seeking "untranscribed transcripts" and a tape recording of Plaintiff's criminal trial arraignment proceedings. Declaration of Natasha Hudgins ("Hudgins Decl.") ¶ 5 and Ex. A. EOUSA received the FOIA request on or about November 8, 2017, and assigned it Request No. FOIA-2017-00301. EOUSA sent a letter to Plaintiff acknowledging the request on or about November 28, 2016. *Id.* ¶ 6 and Ex. B.

EOUSA subsequently sent a search request to the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") to conduct a search for records responsive to Plaintiff's FOIA request. EOUSA determined that USAO-SDNY was the proper place to search based on Plaintiff's FOIA request. *See Performance Coal Co. v. U.S. Dep't of Labor*, 847 F. Supp. 2d 6, 12-13 (D.D.C. 2012) (finding agency's search "reasonably tailored" when it identified two of 18 regional offices most likely to maintain responsive records and it searched those offices' paper, electronic, and archived files). USAO-SDNY conducted a search for public records but did not locate any public records responsive to Plaintiff's FOIA request. *Id.* ¶ 7.

On or about November 16, 2017, EOUSA provided Plaintiff with a final determination response via first class mail. By that response, EOUSA issued a "no records" response. *Id.* ¶ 8 and Ex. C. The final response letter from EOUSA properly outlined Plaintiff's rights to appeal. Plaintiff appealed EOUSA's final response to OIP in December 2017. *Id.* ¶ 9. On or about March 16, 2018, OIP made a final determination on Plaintiff's appeal, affirming EOUSA's final determination and search for records. *Id.* ¶ 10 and Ex. D.

Plaintiff submitted a FOIA request dated January 21, 2018, to EOUSA. EOUSA received the request on or about February 2, 2018, and assigned it tracking number EOUSA-2018-002349. Plaintiff's FOIA request sought copies of payments made by Plaintiff as a result of his criminal trial. *Id.* ¶ 11 and Ex. E. On or about February 22, 2018, EOUSA sent Plaintiff a final response, acknowledging the request and notifying Plaintiff that a notarized signature or certification of identity under penalty of perjury was necessary to process Plaintiff's request. *Id.* ¶ 12 and Ex. F.

Plaintiff submitted a FOIA request dated February 26, 2018, to EOUSA. EOUSA received the request on or about March 12, 2018, and assigned it tracking number EOUSA-2018-002868. Plaintiff referenced request number EOUSA-2018-002349 and attached the certification of

identity form, so EOUSA interpreted the request as seeking the copies of payments listed in the previous request. *Id.* ¶ 13 and Ex. G. On or about April 19, 2018, EOUSA sent Plaintiff an acknowledgment letter and provided Plaintiff with the tracking number for his request. *Id.* ¶ 14 and Ex. H.

On or about April 19, 2018, EOUSA sent a search request to USAO-SDNY to locate records responsive to Plaintiff's request. EOUSA received the search results from USAO-SDNY on or about July 2, 2018, with a two-page chart of payments made by Plaintiff. USAO-SDNY further explained to EOUSA that all official copies of records concerning the type of payments in question are under court control, and that the district does not generally maintain those records outside of the information as shown in the record returned to EOUSA for processing. *Id.* ¶ 15.

EOUSA processes requests on a "first-in-first-out" basis to the extent possible in an effort to be fair to all requesters. Plaintiff's request was placed in line for processing based on this policy. *Id.* ¶ 16. EOUSA sent the final response to Plaintiff on or about July 3, 2018, via USPS certified mail, tracking number 7001-2510-0008-0110-6066. The response constituted a full release of two pages of records that were maintained at USAO-SDNY at the time of the search, and no redactions or exemptions to the release were claimed on the records. EOUSA further informed Plaintiff that the official records concerning his payments were judicial records. *Id.* ¶ 17 and Ex. I.

Following USAO-SDNY's search of all of its offices for agency records potentially responsive to Plaintiff's FOIA request, EOUSA reviewed those records to determine whether they were exempt from disclosure under FOIA. *Id.* ¶ 18. All responsive records related to Plaintiff's FOIA requests were processed to achieve maximum disclosure consistent with the provisions of FOIA and former Attorney General Eric Holder's March 19, 2009, memorandum to federal executive agencies that provided detailed instructions to federal agencies regarding the application

of FOIA. *Id.* ¶ 19. EOUSA has provided Plaintiff with all non-exempt records responsive to his FOIA request and has properly provided Plaintiff with all public records without redaction. *Id.* ¶ 22.

## II.     BOP PROPERLY APPLIED PRIVACY ACT EXEMPTION (j)(2)

The Privacy Act generally provides individuals a right of access to records about themselves in agency records unless a Privacy Act exemption applies. 5 U.S.C. § 552a(j)(2). The information Plaintiff sought about himself is exempt from disclosure under the Privacy Act. 28 C.F.R. § 16.97; *see also* 28 C.F.R. § 513.50. Information about third parties contained in agency records cannot be provided to Plaintiff in the absence of "the prior written consent of [ ] the individual to whom the record pertains." 5 U.S.C. § 552a(b) (requiring the written consent of third parties). FOIA is the sole avenue of relief available to Plaintiff. *See* 5 U.S.C. § 552a(b)(2); 28 C.F.R. § 513.50 (stating Privacy Act requests will be processed under FOIA); Wirth Decl. ¶ 26.

## III.    BOP PROPERLY APPLIED FOIA EXEMPTIONS IN RESPONDING TO PLAINTIFF'S FOIA REQUEST.

BOP properly applied FOIA Exemptions in responding to Plaintiff's FOIA requests.[1]

### BOP Properly Applied FOIA Exemptions 6, 7, 7(C), and 7(F).

As a threshold matter, FOIA Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such records or information" would result in one of six specified harms. 5 U.S.C. § 522(b)(7). Law enforcement within the meaning of FOIA Exemption 7 includes enforcement pursuant to both civil and criminal statutes. *See, e.g., Tax Analysts v. IRS*, 294 F.3d 71, 76-77 (D.C. Cir. 2002).

---

[1] EOUSA has provided Plaintiff with all non-exempt responsive records to his FOIA request and properly provided Plaintiff with all responsive records without redaction. Hudgins Decl. ¶ 22.

Exemption 7(C) allows an agency to withhold records or information compiled for law enforcement purposes to the extent that production could reasonably be expected to constitute an unwarranted invasion of personal privacy. In this case, BOP applied Exemption 6 in conjunction with Exemption 7(C) to protect from disclosure the identifiers of third parties mentioned in the agency records released to Plaintiff. Wirth Decl. ¶ 28; Eichensehr Decl. ¶ 37.

Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. *Pratt v. Webster*, 673 F.2d 408, 416 (D.C. Cir. 1982); *see, e.g., Abramson v. FBI*, 456 U.S. 615, 622 (1982) (explaining that in order to assert "Exemption 7 privilege" requested record must have been compiled for law enforcement purposes). Law enforcement agencies such as BOP must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duties of that agency. *See, e.g., Pub. Emps. for Envtl. Responsibility v. U.S. Sec'y Int'l Boundary & Water Comm'n*, Civ. A. No. 11-261, 2012 WL 933709, at *15-17 (D.D.C. Mar. 20, 2012) (declaring that "courts recognize that law enforcement within the meaning of the Exemption 7 threshold extends to matters of homeland security").

To show that documents were compiled for law enforcement purposes, BOP need only establish a rational nexus between a record and one of the agency's law enforcement duties. *See Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (reiterating that to "show that the disputed documents were 'compiled for law enforcement purposes,' the FBI need only 'establish a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law); *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926 (D.C. Cir. 2003) (holding that declarations must

23

establish (1) rational basis between investigation and one of agency's law enforcement duties and (2) connection between individual or incident and a possible security risk or violation of federal law); *Hammouda v. DOJ*, No. 12-0130, 2013 WL 303191, at *4 (D.D.C. Jan. 31, 2013) (finding threshold requirement established where agency established rational nexus); Wirth Decl. ¶ 30; Eichensehr Decl. ¶ 38. BOP's primary responsibility is to protect all persons charged with or convicted of offenses against the United States, as well as the law enforcement detention staff and the community. The nature and contents of Plaintiff's Central File show that the requested records relate to a law enforcement purpose. *See* 18 U.S.C. § 4042; Wirth Decl. ¶ 31; Eichensehr Decl. ¶ 39. Included are the highly sensitive and frequently sealed presentence investigative reports, the sentencing judge's statement of reasons, other sentence and detainer data, security classification materials, background check materials (including NCIC reports) for visitors, conduct, work, and quarters reports, release processing, and general correspondence. *See Balderrama v. DHS*, No. 04-1616, 2006 WL 889778, at *1, *7-9 (D.D.C. Mar. 30, 2006) (explaining that "Pre-Sentence Investigation Reports," which are routinely prepared regarding all convicted felons during prosecution process are part of law enforcement file and thus satisfy law enforcement requirement). The fact that some of these records are mundane does not mean they lack a rational nexus to BOP's law enforcement mission. Wirth Decl. ¶ 31; Eichensehr Decl. ¶ 39.

The documents in Plaintiff's Central File were generated as part of BOP's law enforcement mission of protecting inmates, staff, and the community. In addition, there is a direct relationship between these records and BOP's duty to ensure the safety of inmates, staff, and the community and its professional decisions as to how to protect inmates. Accordingly, with a few exceptions, the responsive records at issue in this case were compiled for law enforcement purposes within the scope of Exemption 7. Wirth Decl. ¶ 32 and n.3; Eichensehr Decl. ¶ 40.

Exemption 7(C) protects the privacy interests of all individuals mentioned in law enforcement records, including – but not limited to – investigators, suspects, witnesses, and bystanders. Exemption 7(C) authorizes the withholding of the photographs, names,[2] and addresses of private individuals appearing in files unless release is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity. Wirth Decl. ¶ 34; Eichensehr Decl. ¶ 42.

In order for the release of records to serve a public interest, the information must shed light on an agency's performance of its statutory duties. Names, likenesses, and other identifying information of most individuals rarely contribute to this public interest or knowledge of how an agency operates. If release of the records serve the public interest, a requester must also demonstrate the public interest is both significant and compelling enough to overcome legitimate privacy interests. If illegal or improper activities are alleged, a requester must produce meaningful evidence – more than a bare suspicion – that would cause a reasonable person to believe the government had engaged in impropriety. Wirth Decl. ¶ 35; Eichensehr Decl. ¶ 43.

Plaintiff does not address any potential public interest at stake in his Complaint or Supplemental Complaint. Plaintiff fails to provide any justification for invading the privacy interests of law enforcement staff, third-party inmates, and citizens who appear in these records. Wirth Decl. ¶ 36; Eichensehr Decl. ¶ 44.

BOP also withheld documents under FOIA Exemption 6, which protects from disclosure records related to "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." To determine whether Exemption

---

[2] A revelation of an individual's name, especially an individual with a passing or tangential relationship to the FOIA request, would merely subject that individual to scrutiny while failing to shed any light on how BOP carries out its mission.

6 would protect the information in question from disclosure, the agency must determine whether (1) the information in question is contained in personnel, medical, or "similar" files, and (2) disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy by balancing the public's right to disclosure of the information against the individual's right to privacy. *See Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1228 (D.C. Cir. 2008); *News-Press v. DHS*, 489 F.3d 1173, 1196-97 (11th Cir. 2007).

The Supreme Court has ruled that the term "similar files" encompasses any government record that concerns a particular individual; the term is not limited to records contained in personnel or medical files. *See, e.g., Dep't of State v. Wash. Post*, 456 U.S. 595, 599-603 (1982). This broad construction of "similar files" was necessary in view of Congress's primary purpose in enacting Exemption 6, which was "to protect individuals from the injury and embarrassment that can result from the necessary disclosure of personal information." *Id*. at 599.

Here, BOP applied Exemption 6 in conjunction with Exemption 7(C) to protect from disclosure the identifiers of third parties mentioned in the agency records released to Plaintiff. Here, each time Exemption 6 was applied, the privacy interest of the third-party individual was weighed against the public's interest, which is an interest in understanding the operations of BOP. Plaintiff has not, anywhere in his Complaint or Supplemental Complaint, identified a specific public interest. Wirth Decl. ¶ 28; Eichensehr Decl. ¶ 37.

Third-party individuals have a recognized privacy interest in not being publicly associated with law enforcement investigations through the release of records compiled for law enforcement purposes. *See SafeCard Servs. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991) (protecting names of third parties). The identities of persons named in law enforcement files (whether or not the named individual is the target of investigations or law enforcement actions) are properly withheld under

Exemptions 6 and 7(C) in recognition of the stigmatizing connotation carried by the mere mention of individuals in law enforcement files. *Id.* at Part II, ¶ 27. *See Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (quoting *Branch v. FBI*, 658 F. Supp. 204, 209 (D.D.C. 1987) ("the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation")); *Southam News v. INS*, 674 F. Supp. 881, 887 (D.D.C. 1987) (finding disclosure of identities of individuals excludable from U.S. "would result in derogatory inferences about and possible embarrassment to those individuals").

The individuals' privacy interest in the information contained in the records outweighs any minimal public interest in the disclosure of the information. Plaintiff has not articulated a sufficient public interest or public need to justify release of this information. *King v. DOJ*, 586 F. Supp. 286, 294 (D.D.C. 1983) ("Where the requester fails to assert a public interest purpose for disclosure, even a less than substantial invasion of another's privacy is unwarranted."), *aff'd*, 830 F.2d 210 (D.C. Cir. 1987). The disclosure of this personally identifiable information ("PII") serves no public benefit and would not assist the public in understanding how BOP is carrying out its statutory responsibilities. Finally, the third parties mentioned in the law enforcement records did not consent to the disclosure of their PII. 6 C.F.R. §§ 5.3(a), 5.21(d); *Yelder v. DOD*, 577 F. Supp. 2d 342, 346 (D.D.C. 2008) (noting that information such as names, addresses, and other personally identifying information creates a palpable threat to privacy); *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 304, 306 (D.D.C. 2007) (stating that "[f]ederal courts have previously recognized a privacy interest in a person's name and address" and concluding that "[g]enerally, there is a stronger case to be made for the applicability of Exemption 6 to phone numbers and addresses"); *Associated Press v. DOJ*, 549 F.3d 62, 65 (2d Cir. 2008) ("Personal information, including a citizen's name, address, and criminal history, has been found to implicate a privacy

interest cognizable under the FOIA exemptions) (Exemptions 6 and 7(C)); *Int'l Bhd. Of Elec. Workers Local No. 5 v. HUD*, 852 F.2d 87, 89 (3d Cir. 1988) (perceiving no public interest in disclosure and therefore protecting employees' social security numbers).

Having determined that the individuals identified in the responsive records have a cognizable privacy interest in not having their information released, BOP then balanced the interest in safeguarding the individuals' privacy from unnecessary public scrutiny against the public's interest in shedding light on the operations and activities of BOP in the performance of its statutory duties.

Exemption 6 is the only authority that applies to the redactions of the names of two FBI agents on document #174 of release number 2017-00843 (Bates page 229). *See* Ex. H (Vaughn Index) at 140-41. Neither Exemption 7(C) nor 7(F) applies to protect the identities of these agents because the document is not a law enforcement document. Nevertheless, Exemption 6 applies to this record. It is a "similar file" as described by FOIA. Wirth Decl. ¶ 29.

The next inquiry is whether the release of the agents' names would constitute a clearly unwarranted invasion of personal privacy. These agents have a substantial privacy interest in having their names withheld from the release of this document. The FOIA request reveals that the information sought concerns an escort conducted in 2002, 16 years ago. To the extent this information was public at the relevant time, it is now practically obscure. *See McGehee v. DOJ*, 800 F. Supp. 2d 200, 234 n.6 (D.D.C. 2011) (noting "it is clear that in our Circuit a privacy interest may be implicated by 'practically obscure' information"). The agents were line-level law enforcement agents conducting a routine prisoner transport. Prisoner or detainee transport is, as a matter of safety and security, carried out with great discretion. Courts have concluded that Exemption 6 protects the identity information of certain law enforcement officers, and FBI agents

have been found to have substantial privacy expectations in their names and addresses. After applying the balancing test, BOP determined that the balancing weighed in favor of protecting the agents' identities. Wirth Decl. ¶ 29.

Exemption 7(F) permits the withholding of:

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual.

BOP asserted Exemption 7(F) in this case to protect staff, inmates, visitors, and any other information that could compromise the humane, orderly, and efficient operation of a prison. Wirth Decl. ¶ 37; Eichensehr Decl. ¶ 45. Behind prison fences and walls, there is an imbalance of power between correctional workers and inmates. For example, inmates are subject to the search of their persons or their living quarters at any time, as a necessary and reasonable security precaution. While shaking down a cell and confiscating contraband is an everyday duty for correctional staff, it is possible that a targeted inmate could carry a grudge for many years. Inside (and outside) BOP facilities, inmates retaliate against BOP staff members daily with frivolous lawsuits, insults, and assaults with, *e.g.*, cocktails of urine and feces, broken broom handles, mop wringers, homemade knives, combination locks dropped into a sock, etc. In over two-dozen instances over the history of BOP, inmates have killed correctional workers. Wirth Decl. ¶ 38.

BOP and other law enforcement agencies routinely use Exemption 7(F) to protect the names and identifying information of law enforcement employees such as special agents, law enforcement officers, government employees, and local law enforcement officers. Courts have held Exemption 7(F) protects BOP employees and other law enforcement personnel from having their names and identifying information released to avoid unnecessary exposure to physical attacks, threats, manipulation, or harassment. Because the phrase "any individual" is broad,

29

Exemption 7(F) protection has also been extended to protect the names and identifying information of inmates, undercover agents, and medical personnel. Wirth Decl. ¶ 39.

Exemption 7(F) was applied to protect the identities of Plaintiff's inmate separatees. *See* 28 C.F.R. § 542.72(f) (concerning separation information). Exemption 7(F) permits the protection of law enforcement information that could reasonably be expected to endanger the life or safety of these third parties. Inmates are classified as separatees for various reasons. *Id.* However, the bottom line is that safety concerns require that they be kept apart. That is, separatees must be housed in different prisons or in housing situations that make physical contact impossible. Exemption 7(F) was applied in this manner on documents 1-7, 9, 11-12, and 104-105 of FOIA Request 2016-03369. *See* Ex. H; Wirth Decl. ¶ 40. This exemption was also applied on document three at pages five through seven. *See* Ex. H; Eichensehr Decl. ¶ 46.

Revealing the names in these responsive documents could expose both BOP and other law enforcement personnel to threats, harassment, harm, and exposure to derogatory inferences all arising in connection with their mention in agency records. Publicity, adverse or otherwise, regarding any particular inmate or activity in a prison could subject prison staff to unnecessary, unofficial questioning concerning prison matters. In the communities where the prison facilities are located, prison staff come into daily contact with the families and associates of inmates. Unfortunately, inmates successfully target and persuade (and in some cases extort) staff into introducing contraband and committing other crimes within prisons. The safety and security concerns presented by compromised law enforcement officers are self-evident. Wirth Decl. ¶ 41.

Exemption 7(F) was also used to redact information unrelated to identity that, if made public, could reasonably be expected to endanger the life or safety of any individual. For example, Plaintiff's presentence investigative report ("PSR") was withheld in full. *See* Ex. H (Vaughn

30

Index) at 76-77; 2017-00843, Bates pp. 65-81, Doc. #34. Physical safety concerns and the authority of Exemption 7(F) support a finding that withholding these records in full was appropriate. *See Schotz v. Samuels*, 72 F. Supp. 3d 81, 89 (D.D.C. 2014). In 2002, BOP declared PSRs and the sentencing court's Statement of Reasons ("SOR") to be contraband "to protect inmates from being coerced by other inmates to produce their PSRs and SORs for illicit purposes." Wirth Decl. ¶ 42. The prohibition on inmate retention of copies of PSRs stifles predatory inmates from coercing weaker inmates into showing PSRs and SORs. This had to be applied to all inmates so that an unwillingness to show the documents could not be deemed an unwillingness because the weaker inmate, for example, cooperated with the government, possessed substantial financial resources, or had a past sexual offense involving minors. This information, loose on a prison compound, "could reasonably be expected to endanger the life or physical safety of any individual." *Id.*

Plaintiff can access his PSR through the local access procedures described at 28 C.F.R. § 513.40; *see also* Wirth Decl. ¶ 8. The D.C. Circuit has concluded that this access is sufficient to satisfy the requirements of FOIA. *See Martinez v. BOP*, 444 F.3d 620, 625 (D.C. Cir. 2006) ("FOIA does not entitle [a requester] to have copies of his PSRs" as long as he is "afforded a meaningful opportunity to review his PSRs and to take notes on them").

Like the PSR, BOP's Intake Screening Form contains information that must, for reasons of danger to life or physical safety, be redacted pursuant to Exemption 7(F) in all FOIA releases. The intake screening process requires an interviewer to ask the inmate a series of questions concerning physical safety. *See* Wirth Decl. ¶ 44; Eichensehr Decl. ¶ 47 (listing the questions concerning sensitive inmate information). BOP redacts the answers to several of these questions in all cases, regardless of the inmate's responses, because the information is incendiary. For

example, an admission of sexual victimhood strongly suggests weakness in prison culture.[3] If an official record shows, for example, that an inmate took certain actions or committed certain crimes, that information would endanger any inmate on any BOP prison compound. The designated intake screening form responses must be handled in the same way as PSRs because predatory inmates will use this information to extort, harass, or even justify assaulting or killing another inmate. Wirth Decl. ¶ 44 and n.5; Eichensehr Decl. ¶ 47.

For these reasons, BOP has properly withheld the information pursuant to Exemption 7(F). *See Amuso v. DOJ*, No. 07-1935, 2009 WL 535965, at *17 (D.D.C. Mar. 4, 2009) (explaining that "[w]hile courts generally have applied Exemption 7(F) to protect law enforcement personnel or other specified third parties, by its terms, the exemption is not so limited; it may be invoked to protect 'any individual' reasonably at risk of harm" (quoting *Long v. DOJ*, 450 F. Supp 2d 42, 79 (D.D.C. 2006)), *amended*, 457 F. Supp. 2d 30 (D.D.C. 2006), *amended further on reconsideration*, 479 F. Supp. 2d 23 (D.D.C. 2007); *see also Anderson v. U.S. Marshals Serv.*, 943 F. Supp. 37, 40 (D.D.C. 1996) (protecting identity of inmate who required separation from incarcerated requester when disclosure could endanger his safety); *Lee v. DOJ*, No. 04-1013, 2007 WL 2852538, at *7 (W.D. Pa. Sept. 27, 2007) (finding agency properly withheld "names and personal information" about inmates involved in investigations of wrong-doing at correctional facilities because disclosure could subject them to "retaliatory physical harm"); *Brady-Lunny v. Massey*, 185 F. Supp. 2d 928, 932 (C.D. Ill. 2002) (finding that release of list of inmates' names would endanger life and physical safety "given inmates' gang ties, interest in escape, and motives for violence").

---

[3] Information that shows an inmate is a sex offender is also extremely dangerous and is protected under Exemption 7(F). Because this information could endanger lives or physical safety, BOP handles Walsh Act information in the same way: it must be redacted without regard to whether the inmate has Walsh Act offense history. *See* Request #2017-00843, Bates p. 58 (under the section "Current CMA Assignments"). *See also* Ex. H (Vaughn Index) at 73-74, doc. #30.

## IV.     DEFENDANTS COMPLIED WITH FOIA'S SEGREGABILITY REQUIREMENT

Under FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b).  Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions."  *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated.  *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Justice*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

BOP reviewed all of the responsive pages in this matter for segregability. That is, after the three apposite exemptions were applied, the remainder was examined to determine whether any reasonably segregable portions of the record could be released. It is understood by BOP that non-exempt information must be released unless that information is inextricably intertwined with exempt portions. After the applications of the exemptions, the only surviving, non-exempt information on some pages was paired down to little more than nonsense, an essentially meaningless, disjointed set of words, phrases, and sentences that have minimal or no information content. Wirth Decl. ¶ 45; Eichensehr Decl. ¶ 48. BOP carefully reviewed former Attorney General Eric Holder's memo dated March 19, 2009, which encourages agencies to make discretionary disclosures and directs agencies to segregate and release non-exempt information. BOP

determined no additional reasonably segregable information existed which could be released to Plaintiff. Wirth Decl. ¶ 46; Eichensehr Decl. ¶ 49.

During the processing of Plaintiff's request, EOUSA individually examined each page line-by-line to identify non-exempt information which could be reasonably segregated and released. EOUSA understood that under FOIA, federal agencies are required to release any portion of the record that is non-exempt and is reasonably segregable from the non-exempt material, and if non-exempt information contained in the record is inextricably intertwined with exempt information, then reasonable segregation is not possible. Hudgins Decl. ¶¶ 20-21.

Defendants have thus established, with reasonable specificity, that responsive documents were released in full or in part after a careful determination that there were no further reasonably segregable portions appropriate for release. Therefore, the Court should find that Defendants have properly complied with their duty to segregate exempt from non-exempt information.

## CONCLUSION

For the foregoing reasons, the Court should conclude that Defendants complied with their

FOIA obligations by conducting adequate searches and grant summary judgment in their favor.

Dated: June 17, 2019     Respectfully submitted,

           JESSIE K. LIU, D.C. Bar No. 472845
           United States Attorney

           DANIEL F. VAN HORN,  D.C. Bar No. 924092
           Chief, Civil Division

By:  _/s/   Scott Leeson Sroka_____
           SCOTT LEESON SROKA, Member of New York Bar
           Assistant United States Attorney
           555 Fourth Street, N.W.
           Washington, D.C. 20530
           (202) 252-7113
           Scott.Sroka@usdoj.gov

           _Attorneys for Defendant_

## CERTIFICATE OF SERVICE

I  HEREBY CERTIFY that on this 17th day of June 2019, I caused a true and correct

copy of the foregoing **Motion for Summary Judgment and related documents** to be sent by

First Class Mail, postage paid, to:

> John A. Petrucelli
> #52397-054
> Allenwood Medium Federal Correctional Institution
> Inmate Mail/Parcels
> P.O. Box 2000
> White Deer, PA 17887

_/s/ Scott Leeson Sroka_
SCOTT LEESON SROKA
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
Office: (202) 252-7113
Fax: (202) 252-2599
Email: Scott.Sroka@usdoj.gov