IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN A. PETRUCELLI,              )
                                 )
        Plaintiff,               )
                                 )        Civil No. 1:18-cv-00729 (CKK)
        v.                       )
                                 )
DEPARTMENT OF JUSTICE,           )
                                 )
Defendant.                       )
_____     )

## DECLARATION OF BOP PARALEGAL SPECIALIST MICHELLE WIRTH

   I, Michelle Wirth, declare as follows:

1.      I am currently employed by the Federal Bureau of Prisons ("BOP") as a

Paralegal Specialist for the Federal Correctional Complex ("FCC") at Allenwood,

Pennsylvania.  I've been in this position since August 10, 2015.  From March 25,

2012, to August 9, 2015, I was a FOIA Paralegal Specialist for the Federal Bureau

of Prisons ("BOP") for the Northeast Regional Office ("NERO").  My office was

located at the United States Penitentiary ("USP") Lewisburg, Pennsylvania.  From

May 10, 1998, to March 25, 2012, I was a Legal Assistant employed by the Federal

Bureau of Prisons ("BOP") for the medium-security Federal Correctional

Institution ("FCI") at Allenwood.  My office was located at White Deer,

Pennsylvania.

1

2.      As part of my official duties on behalf of the BOP as a FOIA Paralegal

Specialist, I coordinated responses to the Freedom of Information Act ("FOIA")

requests made to the BOP for records maintained in the Northeast Region.  Based

on my current position and past experience in the BOP, I am familiar with the

procedures adhered to by the BOP in responding to requests for information from

files received pursuant to the provisions of the FOIA and 5 U.S.C. §552a,

commonly known as the Privacy Act of 1974 ("PA").  I had access to all of the

FOIA and Privacy Act ("FOIA/PA") files of the requests processed in NERO.  I

am familiar with, and I have received training on, the policies and procedures

regarding the processing and release of information under the FOIA/PA.   My

responsibilities include:  processing complex FOIA requests, conducting searches

for agency records, tracking the collection of documents, sending reminders to

staff in the field regarding outstanding searches to be conducted, questioning staff

members concerning the existence of records and the contents of the systems of

records they curate and search in the course of their official duties, drafting

correspondence to requesters, and discussing FOIA matters with the Department of

Justice's (DOJ) Office of Information Policy (OIP) related to the BOP.  When I

process records, I apply the FOIA statutory exemptions.  See 5 U.S.C. § 552(b).

Due to the nature of my official duties, I am familiar with the procedures followed

by the BOP in responding to requests for information from its files pursuant to the

2

Privacy Act and the FOIA.  Specifically, I am aware of the BOP's handling of Mr. Petrucelli's request to the BOP, which sought access to records concerning himself.

3.      Until on or about May 2017, I had access to all FOIA files processed by the BOP.  In addition to the FOIA statute itself, requests for BOP records are governed by the DOJ's FOIA regulations, see 28 C.F.R. Part 16, and the BOP's FOIA regulations, see 28 C.F.R. Part 513.  The BOP processes all requests for records by individuals (or entities) under the FOIA and PA in order to provide requesters the maximum disclosure authorized by law.

<u>BOP Systems of Records and Databases</u>

4.      A list of the major active systems of records of the BOP concerning inmates is posted publicly at:  https://www.justice.gov/opcl/doj-systems-records#BOP. The most frequently requested systems that render responsive documents are:  the Prison Intelligence Record System (the database is called Tru-Intel), the Inmate Administrative Remedy Record System, the Inmate Central Records System, the Inmate Trust Fund Accounts and Commissary Record System, the Inmate Physical and Mental Health Record System, the Inmate Safety and Accident Compensation Record System, the Telephone Activity Records System, the Office of Internal Affairs Investigative Records, the Inmate Electronic Message Record System (the database is called TRULINCS), and the Federal Tort Claims Act Record System.

3

In addition to these systems, the BOP's SENTRY database is frequently the subject of requests.  SENTRY is an electronic media application that is comprised of data of activities within the multiple BOP published systems of records.  Data is keyed into this database so that BOP employees can easily access certain inmate information nationwide.  So, while a SENTRY report is an agency record, it is merely an electronic abstract of other record systems.

5.      The major active system of records concerning BOP staff are posted publicly at:  https://www.opm.gov/information-management/privacy-policy/#url=Systems-of-Records-Notices.  The most frequently requested systems that render responsive documents are:  Personnel Investigation Records, General Personnel Records, Employee Performance File System Records, and Records of Adverse Actions. There are also programs and databases concerning staff that may render responsive documents.  For example, the BOP's nationwide Groupwise E-mail communication system for employees is a frequent target of requesters.

6.      The records systems described above are the ones most likely to render responsive records.  The BOP's Records and Information Management Office coordinates with the National Archives and Records Administration to manage the disposition of over 180 systems of records.

7.      The Inmate Central Records Systems is essentially an inmate's "Central File."  In order to effectively manage the inmate population, the Bureau of Prisons

4

collects information regarding an inmate in a Central File that is maintained at the inmate's current or last institution of confinement if the inmate has been released from BOP custody.  See Program Statement 5800.11, Inmate Central File, Privacy Folder, and Parole Mini-Files (available at www.bop.gov).  An inmate's Central File is divided into six sections:  (1) Sentence Data/Detainers/Inmate Financial Responsibility Program; (2) Classification/Parole Material; (3) Mail, Visits, and Property, etc.; (4) Conduct, Work and Quarters Reports; (5) Release Processing; and (6) General Correspondence.  See Program Statement 5800.11, p. 5.

8.     Documents maintained in an inmate's Central File include—but are not limited to—his Judgment and Commitment Order, Presentence Investigation Report, sentence computation documents, Transfer Orders (BP-399), Requests for Transfer, Requests for Management Variables, custody classifications, approved visiting lists, Discipline Hearing Officer Packets, and Inmate Requests to Staff. See Program Statement 5800.11, p. 6-11.  An inmate has the option to look at and make copies of the majority of his Central File materials.  Id. at page 10; see also 28 C.F.R. § 513.40.   This procedure is not required by either the Freedom of Information Act or Privacy Act, but is in accordance with sound correctional practices.  See Program Statement 5800.11, at p. 10.  Only FOIA exempt materials are unavailable for this local review.  Id. at 12.  A similar procedure allows inmates to access their medical records at the local level.  See 28 C.F.R. § 513.42.

5

9.      The BOP's policy on what is withheld from inmate access to the Central File

favors transparency.  "Discipline records, such as Unit Discipline Committee

(UDC) and Discipline Hearing Officer (DHO) packets (including the UDC/DHO

report, incident report, notice of hearing, list of inmate rights at UDC/DHO

hearing, notice of placement in Administrative Detention, and investigative

memoranda), shall be maintained together in the Privacy Folder <u>only</u> if a portion of

an investigation or other discipline record contains non-disclosable materials.

Copies of all releasable documents shall be placed together in the disclosable

section of the Inmate Central File."  Program Statement 1351.05, Release of

Information, P.15 (emphasis added) (available on www.bop.gov).

<u>Exhibits and Administrative History</u>

10.     I hereby swear and affirm that the following relevant documents are true and

accurate copies of documents used in the BOP's responses to Mr. Petrucelli's

FOIA request:

> a) On 7 March 2016, the BOP received Mr. Petrucelli's FOIA request
> that was logged as request number 2016-03369.  Mr. Petrucelli
> requested "[a]ny and all information in which your agency ma[y]
> have records of my name John Petrucelli which may be mixed up
> as part of a routine investigation with DOJ employees."  Exhibit A.
>
> b) On 8 August 2016, the BOP released to Mr. Petrucelli 245 pages of
> responsive records.  Nine pages were released in full, 87 pages
> were released in part, and 149 pages were withheld in full.  These
> records were from the FOIA-Exempt Privacy Folder of Mr.

Petrucelli's Central File.  The withholdings were pursuant to Exemptions (b)(6), (b)(7)(C), and (b)(7)(F).  Exh. B.

c)  On 8 December 2016, in the wake of discussions between the Office of Information Policy (OIP) and the BOP, the BOP released the full remainder of the records in Mr. Petrucelli's Central File, which amounted to 261 pages of responsive records.  This supplemental release was performed under request number 2017-00843.  Fifty of these pages were released in full, 193 pages were released in part, and 18 pages were withheld in full.  The withholdings were pursuant to exemptions (b)(6), (b)(7)(C), and (b)(7)(F).  Exh. C.

d)  In a letter dated 18 January 2017, the OIP granted administrative relief on Mr. Petrucelli's appeal of BOP Request number 2016-03369.  Exh. D.  The OIP remanded the request "for further processing of one page of responsive records."  Id.  The OIP otherwise affirmed the BOP's application of the exemptions, and further determined that the BOP had conducted an adequate search following the supplemental release performed under request number 2017-00843.  Exh. D at pp. 1-2.

e)  In response to the remand, the BOP opened request number 2017-02392, reprocessed the one page of records in accordance with the remand, and released the record to Mr. Petrucelli in a letter dated 27 January 2017.  Exempt information was withheld pursuant to (b)(6) and (b)(7)(C).  Exh. E.

f)  In a letter dated 6 April 2017, the OIP again granted administrative relief, but this time regarding the supplemental release under request number 2017-00843.  Exh. F.  The OIP remanded the request "for further processing of two responsive records."  Id. The OIP otherwise affirmed the BOP's application of exemptions, and determined that the BOP had conducted an adequate, reasonable search.  Id. at pp. 1-2.

7

g) In a letter dated 11 June 2018—under request number 2017-03853—the BOP located, reprocessed, and released the pages remanded by the OIP.  Exh. G.  The BOP noted that the roughly 14-month delay in responding to the remand was because of an administrative error.  Id.

A comprehensive, 153-page Vaughn[1] index to these releases is attached as Exhibit H.  A post-Vaughn Index release letter (BOP FOIA # 2018-07612-LIT) is attached as Exhibit I.  On 26 September 2018, non-exempt or segregable material was released on 47 pages of the total already released to Mr. Petrucelli in 2016-03369, 2017-00843, 2017-02392, and 2017-03853.  Id.  Following this release, all responsive, non-exempt, and segregable information was released to Mr. Petrucelli. See Vaughn Index 2016-03369, documents 2, 5-6, 12, 18, 36, 41, 49, 52, 101, 105, 133; 2017-00843, documents 1-4, 10, 22-24, 29-30, 33, 41, 78-80, 82-87, 167, 192 194-95; 2017-02392, document 1.  Exh. H (each byte of additional information disclosed to Mr. Petrucelli is explicitly addressed in the Vaughn Index).

<u>Mr. Petrucelli's Complaint and Supplemental Complaint</u>

11.    I am familiar with the Complaint and the Supplemental Complaint filed by Mr. Petrucelli.  Docket entries (dkt.) ## 1 & 7.  Mr. Petrucelli dated the original complaint as submitted on 25 January 2018.  Dkt. #1, p. 8 (PACER-stamped page numbering will be used).  It was filed on 2 February 2018.

---

[1] Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir, 1973).

12.     If they are given the fullest possible benefit of the doctrine of liberal

construction, Mr. Petrucelli's pro se Complaint and Supplemental Complaint state

the following claims:  (1) the BOP improperly construed his search terms (id. at p.

3, ¶ 11); (2) the BOP failed to comply with an OIP remand to disclose two pages

(id. at p. 2, ¶ 7); (3) the BOP improperly applied the FOIA exemptions (id. at p. 3,

¶ 9); and (4) the BOP's search was not reasonably adequate.  Dkt. #7, p. 2.

13.     Regarding the search terms, Petrucelli contends that the BOP improperly

"changed the search request from 'Any DOJ employee who could be mixed up in

the investigation with John Petrucelli,' to 'All information about John Petrucelli.'"

Dkt. #1, p. 3, ¶ 11.  As noted above, the actual request states "[a]ny and all

information in which your agency ma[y] have records of my name John Petrucelli

which may be mixed up as part of a routine investigation with DOJ employees."

Exhibit A.  The BOP liberally construes request language, particularly when a

requester is proceeding pro se.

14.     When an inmate requests records about himself or list his name as the sole

search term, it is the practice of the BOP to construe this as a request for that

inmate's Central File, including the FOIA-exempt Privacy Folder.   This is because

the Central File is the comprehensive record that is most likely to render

responsive documents.  The 8 August 2016 BOP initial response letter describes

the search in terms that match Petrucelli's request language.  Exhibit B.  OIP used

the shorthand phrases "request for access to records concerning yourself" and

"certain information concerning yourself" in appeal letters.  See exhs. D, F, & H.

This may be the source of Mr. Petrucelli's allegation.  It is submitted that the BOP

did not improperly narrow the scope of Mr. Petrucelli's request language.  This

conclusion is supported by a statement from Mr. Petrucelli's Supplemental

Complaint.  He writes, "Plaintiff Is A Pro-Se Litigant Who Is Only Trying To

Obtain Information *About Himself* That He Believes Has Been Improperly

Withheld."  Dkt. #7, pp. 2-3 (emphasis added).  In the absence of any other

parameters, it was a reasonably calculated search for the BOP to search Mr.

Petrucelli's Central File for records concerning "the name John Petrucelli."

<u>Delayed Compliance with a Remand</u>

15.     Mr. Petrucelli is not correct in his claim that the BOP failed to disclose two

pages of records in response to an OIP remand.  The release was late.  At the time

Mr. Petrucelli filed his Complaint, the BOP had not complied with the OIP remand

in case number DOJ-AP-2017-001564.  Exh. F.  The remand was not acted upon

promptly because of an administrative error.  Nevertheless, the BOP corrected the

error in a letter dated 11 June 2018—under request number 2017-03853.  The BOP

located and released the pages remanded by the OIP with the relevant excisions

removed.  (Exh. G).  Justification for the exemptions used following remand are

provided at Exhibit H, pp. 152-53.

## Search and Processing

16.    An inmate's Central File is in paper format, and it is generally maintained at the inmate's current institution.  The files are stored alphabetically by inmate name in secure fireproof cabinets in the unit team offices of the housing unit where the inmate lives.  During all times relevant to this declaration, Mr. Petrucelli has been housed at FCI Allenwood in White Deer, PA.

17.    The Northeast Regional Office received Mr. Petrucelli's FOIA request on 24 March 2016, and on the same dated forwarded, via e-mail, a request for documents to FCI Allenwood.  In that request, John Petrucelli asked for "[a]ny and all information in which your agency ma[y] have records of my name John Petrucelli which may be mixed up as part of a routine investigation with DOJ employees." Exh. A.

18.    I opened the e-mail, read the request, and determined that the request should be construed as a request for the Privacy Folder (also known as the FOIA-Exempt Section) of Mr. Petrucelli's Central File.  This determination was based on the fact that Mr. Petrucelli could review the remainder of the Central File, in unredacted form, through local review procedures.

19.    On 24 March 2016, I sent the request for documents to the Unit Manager to obtain the FOI exempt records from John Petrucelli's central file.  The Unit Secretary for Mr. Petrucelli's unit conducted the search for Mr. Petrucelli's file.

Upon reviewing Petrucelli's Central File, she located two hundred and forty-five pages of potentially responsive documents.  These records were forwarded to me on 28 March 2016.  On 19 July 2016, I began processing the responsive documents.  On or about August 8, 2016, the BOP sent a determination letter to Mr. Petrucelli.  The letter stated the BOP's initial conclusion that nine pages were appropriate for release in full; eighty-seven pages were appropriate for release in part, and one hundred forty-nine pages were withheld in their entirety.  Exh. B.

20.     On 4 November 2016, OIP directed that all sections of John Petrucelli's Central File be searched and processed, not just the FOI Exempt Section.  Exh. C. On 8 November 2016, I sent a request for documents to the Case Manager to obtain John Petrucelli's remaining Central File records.  The Case Manager for Mr. Petrucelli's unit conducted the search for Mr. Petrucelli's file.  Upon reviewing Petrucelli's Central File, he located two hundred and sixty-one pages of potentially responsive documents.  These records were forwarded to me on 8 November 2016. On 15 November 2016, I began processing the responsive documents.  On or about 8 December 2016, the BOP sent a determination letter to Mr. Petrucelli.  The letter stated the BOP's conclusion that fifty pages were appropriate for release in full; one hundred ninety-three pages were appropriate for release in part, and eighteen pages were withheld in their entirety.  Exh. C.

21.     In a remand letter dated 18 January 2017, OIP ordered the BOP to reprocess one page withheld in full to be withheld only in part to release Mr. Petrucelli's full name.  OIP Otherwise affirmed BOP's action on the request.  Exh. D.

22.     On 26 January 2017, another processor began processing the remanded document.  On or about January 27, 2017, the BOP sent a determination letter to Mr. Petrucelli.  The letter stated one page is appropriate for release in part.  Exh. E. This document was further segregated in anticipation of litigation.  See Vaughn Index, pp. 151-52.  Request 2017-02392, Doc. #1; Exhs. H & I.

23.     On 6 April 2017, OIP remanded BOP request number 2017-00843 for further processing of two pages of responsive records.  Otherwise, the OIP affirmed BOP's action on 2017-00843.  Exh. F.

24.     On 10 April 2017, I began processing the two pages of remanded documents and prepared the determination letter.  It was sent to NERO for review that same day.  Because of an administrative error, the two pages were not released to Mr. Petrucelli until 11 June 2018, after the filing of this lawsuit.  Exh. G.

25.     The BOP conducted an adequate search once Mr. Petrucelli's *entire* Central File was gathered for processing.  The initial search, under 2016-03369, for only the FOIA-exempt Privacy Folder from the Central File was admittedly too narrow and therefore inadequate.  See Exhibit B.  Nonetheless, the error was cured when the BOP made a supplemental release of the remainder of Mr. Petrucelli's Central

13

File in 2017-00843.  Exhibit C.  At that point, with Mr. Petrucelli's search

parameters, there was no other location to be searched that was reasonably likely to

render responsive documents.

THE PRIVACY ACT

26.     I am familiar with the procedures BOP follows when responding to requests

for information pursuant to the provisions of the FOIA and the Privacy Act of

1974.  See 5 U.S.C. § 552a.  Mr. Petrucelli requested information about himself

contained in BOP systems of records.  Exhibit A.  The PA generally provides

individuals a right of access to records about themselves in agency records unless a

PA exemption applies.  5 U.S.C. §552a(j)(2).  The information Mr. Petrucelli seeks

about himself is exempt from disclosure under the PA.  28 C.F.R. § 16.97; see also

28 C.F.R. § 513.50.  Information about third parties contained in agency records

cannot be provided to Mr. Petrucelli in the absence of "the prior written consent of

[] the individual to whom the record pertains . . . ."  5 U.S.C. § 552a(b) (requiring

the written consent of third parties).  The FOIA is the sole avenue of relief

available to Mr. Petrucelli.  § 552a(b)(2); 28 C.F.R. § 513.50 (stating Privacy Act

requests will be processed under the FOIA).

## JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

27.     The records responsive to Mr. Petrucelli's request were processed to achieve

maximum disclosure consistent with FOIA.  Every effort was made to provide Mr.

Petrucelli with all reasonably segregable nonexempt information in the responsive

records.  No reasonably segregable nonexempt portions were withheld from Mr.

Petrucelli.  Further description of the information withheld, beyond what is

described in this declaration, could identify the actual exempt information the BOP

has protected.

### Exemption (b)(6) Regarding Privacy

28.     The BOP relied upon exemption (b)(6), which exempts from disclosure

"personnel and medical files and similar files the disclosure of which would

constitute a clearly unwarranted invasion of personal privacy . . . . "  5 U.S.C.

§ 552(b)(6).[2]  All information that applies to a particular person falls within the

scope of Exemption 6.  Subpart (b)(6) was invoked as authority for the redaction or

withholding of the identifiers of third parties mentioned in the agency records

released to Mr. Petrucelli.  Each time exemption (b)(6) was used, the privacy

---

[2] It is the practice of the BOP to assert Exemption 6 with Exemption 7(C).  Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.  The privacy interests are balanced against the public's interest in disclosure under bother exemptions.

interest of the third-party individual was weighed against the public's interest,

which is an interest in understanding the operations of the BOP.  Mr. Petrucelli has

not, at any place in his Complaint or Supplemental Complaint, identified a specific

public interest.

29.     Exemption (b)(6) is the only authority that applies to the redactions of the

names of two FBI agents on document # 174 of release number 2017-00843 (Bates

page 229).  See exh. H (Vaughn Index) pp. 140-41.  Neither (b)(7)(C) nor (b)(7)(F)

applies to protect the identities of these agents because the document is not a law

enforcement document. Nevertheless, exemption (b)(6) does apply to this record.

It is a "similar file" as described by the statute.  The next question is whether the

release of the agents' names would constitute a clearly unwarranted invasion of

personal privacy.  These agents have a substantial privacy interest in having their

names withheld from the release of this document.  The FOIA request reveals that

the information sought concerns an escort conducted in 2002, sixteen years ago.

To the extent this information was public at the relevant time, it is now practically

obscure.  The agents were line-level law enforcement agents conducting a routine

prisoner transport.  Nothing about their positions or duties diminishes their privacy

expectations.  In fact, prisoner or detainee transport is, as a matter of safety and

security, carried out with great discretion.  Courts have concluded that (b)(6)

protects the identity information of certain law enforcement officers, and FBI

16

agents have been found to have substantial privacy expectations in their names and addresses.  Balancing favor protecting the agents' identities.

<u>The Exemption (b)(7) Threshold</u>

30.    The BOP properly employed Exemption 7 in response to Mr. Petrucelli's FOIA request.  Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure would cause an enumerated harm.  5 U.S.C. § 552(b)(7).  In order to withhold documents under Exemption 7, the agency must, as a preliminary matter make a threshold showing demonstrating that the records were compiled for a law enforcement purpose.  To show that documents were compiled for law enforcement purposes, the BOP need only establish a rational nexus between a record and one of the agency's law enforcement duties.

31.    The BOP's primary responsibility is to protect all persons charged with or convicted of offenses against the United States, as well as the law enforcement detention staff and the community.  The nature and contents of the Central File show that the requested records relate to a law enforcement purpose.  18 U.S.C. § 4042.  Included are the highly-sensitive and frequently sealed presentence investigations reports; the sentencing judge's statement of reasons; other sentence and detainer data; security classification materials; background check materials

(including NCIC reports) for visitors; conduct, work and quarters reports; release processing; and general correspondence.  See Program Statement 5800.11, p. 5. The fact that some of these records are mundane does not mean they lack a rational nexus to the BOP's law enforcement mission.

32.     The documents in Mr. Petrucelli's Central File were generated as part of BOP's law enforcement mission of protecting inmates, staff, and the community. In addition, there is a direct relationship between these records and the BOP's duty to ensure the safety of inmates, staff, and the community and its professional decisions as to how to protect inmates.  Accordingly, with a few exceptions,[3] the responsive records at issue in this case were compiled for law enforcement purposes within the scope of Exemption 7.

## Exemption (b)(7)(C) Concerning Privacy

33.     Exemption (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  When determining whether redacting or withholding records under Exemption 7(C) is proper, my staff and I weigh the privacy interests at stake against the public interest in disclosure of the information.  To overcome a

---

[3] These exceptions are:  a FOIA request (Vaughn doc. #229, pages 140-42); e-mail correspondence concerning a FOIA search (doc.# 230, pp.142-43); a printout of a PACER docket sheet (doc.# 131, p. 150); and a pro se handwritten court order.  Doc. 261, p. 151.

legitimate privacy interest, a requestor must:  (1) demonstrate the public interest is a significant one and more than having the information for its own sake; and, (2) show the information is likely to advance that interest.  Exemption 7(C)'s privacy protections extend to personally identifiable information that appears in law enforcement records.

34.    Exemption 7(C) protects the privacy interests of all individuals mentioned in law enforcement records, including—but not limited to—investigators, suspects, witnesses, and bystanders.  Exemption 7(C) authorizes the withholding of the photographs, names, [4] and addresses of private individuals appearing in files unless release is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.

35.    In order for the release of records to serve a public interest, the information must shed light on an agency's performance of its statutory duties.  Names, likenesses, and other identifying information of most individuals rarely contribute to this public interest or knowledge of how an agency operates.  If release of the records serve the public interest, a requester must also demonstrate the public interest is both significant and compelling enough to overcome legitimate privacy interests.  If illegal or improper activities are alleged, a requester must produce

---

[4] A revelation of an individual's name, especially an individual with a passing or tangential relationship to the FOIA request, would merely subject that individual to scrutiny while failing to shed any light on how the BOP carries out its mission.

19

meaningful evidence—more than a bare suspicion—that would cause a reasonable person to believe the government had engaged in impropriety.

36.     Mr. Petrucelli does not address any potential public interest at stake in his Complaint.  He decries redactions in his records.  Mr. Petrucelli fails to provide any justification for invading the privacy interests of law enforcement staff, third-party inmates, and the citizens who appear in his records.

Exemption (b)(7)(F)

37.     Exemption (b)(7)(F) permits the withholding of information obtained for law enforcement purposes that, if made public, could reasonably be expected to endanger the life or safety of any individual.  The BOP employs this exemption to protect staff, inmates, visitors, and any other information that could compromise the humane, orderly, and efficient operation of a prison.

38.     Behind prison fences and walls, there is an imbalance of power between correctional workers and inmates.  For example, inmates are subject to the search of their person and their living quarters at any time, as a necessary and reasonable security precaution.  While shaking down a cell and confiscating contraband is an everyday duty for correctional staff, it is possible that a targeted inmate could carry a grudge for many years.  Inside (and outside) BOP facilities, inmates retaliate against BOP staff members daily with frivolous lawsuits, insults, and assaults with, *e.g*., cocktails of urine and feces, broken broom handles, mop wringers, homemade

knives, combination locks dropped into a sock, etc.  In over two-dozen instances over the history of the BOP, inmates have killed correctional workers.

39.     The BOP and other law enforcement agencies routinely use Exemption (b)(7)(F) to protect the names and identifying information of law enforcement employees such as special agents, law enforcement officers, government employees, and local law enforcement officers.  Courts have held Exemption 7(F) protects BOP employees, and other law enforcement personnel, from having their names and identifying information released to avoid unnecessary exposure to physical attacks, threats, manipulation, or harassment.  Because the phrase "any individual" is broad, Exemption (7)(F) protection has also been extended to protect the names and identifying information of inmates, undercover agents,  and medical personnel.

40.     Exemption (b)(7)(F) was used to protect the identities of Mr. Petrucelli's inmate separatees.  See 28 C.F.R. § 542.72(f) (concerning separation information). Exemption (7)(F) permits the protection of law enforcement information that could reasonably be expected to endanger the life or safety of any individual.  Disclosure of this information could threaten lives or the physical safety of these third parties. Inmates are classified as separatees for various reasons (§ 542.72(f)); however, the bottom line is safety concerns require that they be kept apart.  That is, they must be housed in different prisons or in housing situations that make physical contact

impossible.  Exemption (b)(7)(F) was used in this manner on documents 1-7, 9, 11-12, and 104-105 of FOIA Request 2016-03369.  See Exhibit H.

41.    Revealing names in these responsive documents could expose both BOP and other law enforcement personnel to threats, harassment, harm, and exposure to derogatory inferences all arising in connection with their mention in agency records.  Publicity, adverse or otherwise, regarding any particular inmate or activity in a prison could subject prison staff to unnecessary, unofficial questioning concerning prison matters.  In the communities where the prison facilities are located, prison staff come into daily contact with the families and associates of inmates.  Unfortunately, inmates successfully target and persuade (and in some cases extort) staff into introducing contraband and committing other crimes within prisons.  The safety and security concerns presented by compromised law enforcement officers are self-evident.

42.    Exemption (b)(7)(F) was also used to redact information unrelated to identity that, if made public, could reasonably be expected to endanger the life or safety of any individual.  For example, Mr. Petrucelli's pre-sentence investigation report was withheld in full.  See Vaughn Index (Exhibit H), pp. 76-77; 2017-00843, Bates pages 65-81, Doc. # 34.  Physical safety concerns and the authority of (b)(7)(F) support a finding that withholding in full was appropriate.  See Schotz v. Samuels, 72 F. Supp. 3d 81, 89 (D.D.C. 2014).  In 2002, the BOP declared PSRs

and the sentencing court's Statement of Reasons (SOR) to be contraband "to protect inmates from being coerced by other inmates to produce their PSRs and SORs for illicit purposes." BOP Program Statement 1351.05, p. 2 ¶ 2 (2002). The prohibition on inmate retention of copies of PSRs stifles predatory inmates from coercing weaker inmates into showing PSRs and SORs.  This had to be applied to all inmates so that an unwillingness to show the documents could not be deemed an unwillingness because the weaker inmate—for example—cooperated with the Government, possessed substantial financial resources, or had a past sexual offense involving minors.  This information, loose on a prison compound "could reasonably be expected to endanger the life or physical safety of any individual." (b)(7)(F).

43.     Mr. Petrucelli can access his PSR through the local access procedures described at 28 C.F.R. § 513.40 and Wirth Declaration ¶ 8.  The Circuit Court for the District of Columbia has concluded that this access is sufficient to satisfy the FOIA.  See Martinez v. Bureau of Prisons, 444 F.3d 620, 625 (D.C. Cir. 2006) ("FOIA does not entitle [requester] to have copies of his PSRs" as long as he is "afforded a meaningful opportunity to review his PSRs and to take notes on them . . . .  Moreover, the BOP Program Statement 1351.05 p. [16-17] . . . sets forth reasons, based on concerns about inmate safety . . . that a court would be loath to second-guess.") (citations omitted).

44.    Like the PSR, the BOP's Intake Screening Form contains information that

must, for reasons of danger to life or physical safety, be redacted pursuant to

(b)(7)(F) in all FOIA releases.  The intake screening process requires an

interviewer to ask the inmate a series of questions concerning physical safety.

They read:

> 1) DO YOU KNOW OF ANY REASON YOU SHOULD NOT BE
> PLACED IN GENERAL POPULATION?
>
> 2) HAVE YOU ASSISTED LAW ENFORCEMENT AGENTS IN ANY
> WAY?
>
> 3) ARE YOU A CIM CASE?
>
> 4) HAVE YOU TESTIFIED AGAINST ANYONE IN COURT?
>
> 5) ARE YOU A MEMBER/ASSOCIATE OF ANY GANG?
>
> 6A) HAVE YOU EVER BEEN SEXUALLY ASSAULTED?
>
> 6B) HAVE YOU RECENTLY BEEN SEXUALLY ASSAULTED?

2017-00843, Bates pages 132-14; Vaughn Index, 2017-00843, documents 78-87,

pp. 97-105.   The form contemplated that the interviewer will check "yes" or "no"

for each question.  The BOP redacts the answers to questions 2 & 4-6B in all cases,

regardless of an inmate's response.  The BOP does this because the information is

incendiary:  informants ("rats" in prison slang), certain gang members, and weak

inmates face threats of physical harm in prisons.  An admission of sexual

victimhood strongly suggests weakness in prison culture.[5]  If an official record

shows—for example--that an inmate took certain actions or committed certain

crimes, that information would endanger any inmate on any BOP prison

compound.  The designated intake screening form responses must be handled in

the same way as PSRs because predatory inmates will use this information to

extort, harass, or even justify—under the primitive rules of prison culture—

assaulting or killing another inmate.

## SEGREGABILITY

45.    In this matter, the BOP reviewed all 506 of the responsive pages for

segregability.  That is, after the three apposite exemptions were applied, the

remainder was examined to determine whether any reasonably segregable portions

of the record could be released.  It is understood that non-exempt information must

be released unless that information is inextricably intertwined with exempt

portions.  After the applications of the exemptions, the only surviving, non-exempt

information on some pages was paired down to little more than nonsense, an

---

[5] Information that shows an inmate is a sex offender is also extremely dangerous and is protected
under (b)(7)(F).  Because this information could endanger lives or physical safety, the BOP
handles Walsh Act information in the same way:  it must be redacted without regard to whether
the inmate has Walsh Act offense history.  See Request # 2017-00843, Bates p. 58 (under the
section "Current CMA Assignments").  See also Vaughn Index (exh. H), p. 73-74, doc. # 30.

essentially meaningless, disjointed set of words, phrases, and sentences that have minimal or no information content.

## DISCRETIONARY RELEASE

46.     Finally, I carefully reviewed Former Attorney General Holder's memo dated 19 March 2009, which encourages agencies to make discretionary disclosures and directs agencies to segregate and release nonexempt information.  I determined no additional reasonably segregable information exists which can be released to the Requester.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.  I also declare all exhibits are true and accurate copies of records maintained by the Federal Bureau of Prisons.

Dated this 30th day of November 2018.


_Michelle Wirth_
Michelle Wirth
Paralegal Specialist
Federal Bureau of Prisons
FCI Allenwood