IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN A. PETRUCELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 1:18-cv-00729 (CKK) |
| v. | ) | |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF BOP GOVERNMENT INFORMATION SPECIALIST LEE-ANNE EICHENSEHR

I, Lee-Anne Eichensehr, declare:

1. I am a Government Information Specialist for the Northeast Regional Office ("NERO") of the Federal Bureau of Prisons ("BOP"). I have held this position since May 2016. My office is located at the United States Penitentiary ("USP") at Lewisburg, Pennsylvania.

2. As part of my official duties on behalf of the BOP as a GIS, I coordinate responses to the Freedom of Information Act ("FOIA") requests made to the BOP for records maintained in the NERO. Based on my current position and my past experience in the BOP, I am familiar with the procedures adhered to by the BOP in responding to requests for information pursuant to the provisions of the FOIA and Privacy Act of 1974 ("PA"). I have access to all of the FOIA and the Privacy Act ("FOIA/PA")

1

files of the requests processed in NERO.  My responsibilities include:  processing

complex FOIA requests, conducting searches for agency records, tracking the

collection of documents, sending reminders to staff in the field regarding

outstanding searches to be conducted, questioning staff members concerning the

existence of records and the contents of the systems of records they curate and

search in the course of their official duties, drafting correspondence to requesters,

and discussing FOIA matters with the Department of Justice's (DOJ) Office of

Information Policy (OIP) related to the BOP.  When I process records, I apply the

FOIA statutory exemptions.  See 5 U.S.C. § 552(b).  In addition to the FOIA

statute itself, requests for BOP records are governed by the DOJ's FOIA

regulations, see 28 C.F.R. Part 16, and the BOP's FOIA regulations, see 28 C.F.R.

Part 513.  The BOP processes all requests for records by individuals (or entities)

under the FOIA and PA in order to provide requesters the maximum disclosure

authorized by law.

3. I have read Mr. Petrucelli's Second Amended complaint.  Docket entry (dkt.) # 14

(PACER-stamped page numbering will be used).  I have personal knowledge

regarding the processing of the FOIA requests Mr. Petrucelli discusses in that

document at paragraphs 29 through 35.  These requests were filed between 10

August 2018 and 27 August 2018.  The requests are numbered:  2018-06810,

2018-06820, 2018-06906, 2018-07118, 2018-06812, 2018-07116, and 2018-07115.

### 4. Exhibits and Administrative History

5. I hereby swear and affirm that the following relevant documents are true and accurate copies of documents used in the BOP's responses to Mr. Petrucelli's FOIA requests listed in the Second Amended Complaint:

a) On 10 August 2018, the BOP received Mr. Petrucelli's FOIA request that was logged as request number 2018-06810. ("FCI Manchester Matters.") Mr. Petrucelli requested records from 2010-2012, a time when he was incarcerated at FCI Manchester. Exhibit A, p. 2.[1] The BOP searched, but found no records responsive to this four-part request. The BOP mailed Mr. Petrucelli a final determination letter on 5 September 2018. Exhibit (Exh.) A.

b) Also on 10 August 2018, the BOP received from Mr. Petrucelli FOIA request number 2018-06812. ("2002 New York Fight"). Mr. Petrucelli asked for records concerning an altercation he was involved in at MCC New York in 2002. Exh. B, pp. 1-2. On 9 May 2019 the BOP mailed to Petrucelli a final determination letter that released five pages of responsive documents. Exh. B, pp. 3-4. One page was released in full and four pages were redacted in part.

c) On 13 August 2018, Mr. Petrucelli filed BOP FOIA request number 2018-06820 ("Cannan to Manchester Transfer"). Exh. C. He sought any and all records concerning his transfer from USP Canaan to FCI Manchester in June 2010. Id. at pp. 1-2. On 10 December 2019, the BOP released two pages of documents that were redacted in part. Exh. C, p. 3.

---

[1] Mr. Petrucelli also references prior FOIA requests 2016-03369 and 2017-00843.

d) On 17 August 2018, Mr. Petrucelli filed request number 2018-06906. ("Manchester to Allenwood Transfer"). He sought any and all records concerning his transfer from FCI Manchester to FCI Allenwood in May 2012. He also asked for records that would show why he was not transferred to FCI McKean. Exh. D, pp. 1-2. On 11 October 2018, the BOP released two pages of records that were redacted in part. Id. at p. 3. On 9 November 2018, Petrucelli filed an appeal with the OIP. In the wake of discussions between the OIP and NERO FOIA, OIP remanded the request for further searching. Id. at p. 10-11. The BOP found an additional 8 pages of responsive records. Under new request number 2019-03001, three of these pages were released in full and five pages were released with excisions. Id. at pp. 12-13.

e) On 27 August 2018, Mr. Petrucelli filed request number 2018-07118 ("2011 FOIA Denial"). He asked for a copy of a final FOIA determination letter that he believed he received from the Mid-Atlantic Regional Office (MARO) of the BOP. Exh. E, p. 1. On 31 August 2018, the BOP released in full a one page of records: a letter from a 2010 NERO FOIA request. Id. at p. 2.

f) Also on 27 August 2018, Mr. Petrucelli filed FOIA request number 2018-07116 (" 2002 Intake Screening"). He sought records concerning a January 2002 intake screening at MDC Brooklyn. Exh. F, p. 1. On 5 April 2019, the BOP released three pages of records. One page was released in full and two pages were excised in part. Id. at p. 2.

g) On 27 August 2018, Mr. Petrucelli filed FOIA request number 2018-07115. ("Brooklyn Cell Assignment"). He asked for records regarding a cell or cells he spent two or three days in at MDC Brooklyn. Exh. G, p. 1. On 24 September 2018, the BOP released two partially redacted pages to Mr. Petrucelli. Id. at p. 2.

6.  A comprehensive, Vaughn[2] index to the releases with exemptions is attached as
    Exhibit H.

## BOP Systems of Records and Databases

7.  A list of the major active systems of records of the BOP concerning inmates is
    posted publicly at:  https://www.justice.gov/opcl/doj-systems-records#BOP.  The
    most frequently requested systems that render responsive documents are:  the
    Prison Intelligence Record System (the database is called TRUINTEL), the Inmate
    Administrative Remedy Record System, the Inmate Central Records System, the
    Inmate Trust Fund Accounts and Commissary Record System, the Inmate Physical
    and Mental Health Record System, the Inmate Safety and Accident Compensation
    Record System, the Telephone Activity Records System, the Office of Internal
    Affairs Investigative Records, the Inmate Electronic Message Record System (the
    database is called TRULINCS), and the Federal Tort Claims Act Record System.
    In addition to these systems, the BOP's SENTRY database is frequently the subject
    of requests.  SENTRY is an electronic media application that is comprised of data
    of activities within the multiple BOP published systems of records.  Data is keyed
    into this database so that BOP employees nationwide can easily access certain
    inmate information.  So, while a SENTRY report is an agency record, it is an
    electronic abstract of other record systems.

---

[2] Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir, 1973).

8. The major active system of records concerning BOP staff are posted publicly at: https://www.opm.gov/information-management/privacy-policy/#url=Systems-of-Records-Notices. The most frequently requested systems that render responsive documents are: Personnel Investigation Records, General Personnel Records, Employee Performance File System Records, and Records of Adverse Actions. There are also programs and databases concerning staff that may render responsive documents. For example, the BOP's nationwide Groupwise E-mail communication system for employees is a frequent target of requesters.

9. The records systems described above are the ones most likely to render responsive records. The BOP's Records and Information Management Office coordinates with the National Archives and Records Administration to manage the disposition of over 180 systems of records.

10. The Inmate Central Records Systems is essentially an inmate's "Central File." In order to effectively manage the inmate population, the Bureau of Prisons collects information regarding an inmate in a central file that is maintained at the inmate's current or last institution of confinement if the inmate has been released from BOP custody. See Program Statement 5800.17, Inmate Central File, Privacy Folder, and Parole Mini-Files (available at www.bop.gov). An inmate's central file is divided into six sections: (1) Sentence Data/Detainers/Inmate Financial Responsibility Program; (2) Classification/Parole Material; (3) Mail, Visits, and Property, etc.;

6

(4) Conduct, Work, and Quarters Reports; (5) Release Processing; and (6) General Correspondence. See Program Statement 5800.17, Appendix A. Although there is a structure to the files, there is no machine-searchable digital version of this record system. The central file is paper, and it can easily run to thousands of pages if an inmate serves a long sentence.

11. Documents maintained in an inmate's Central File include—but are not limited to—his Judgment and Commitment Order, Presentence Investigation Report, sentence computation documents, Transfer Orders (BP-399), Requests for Transfer, Requests for Management Variables, custody classifications, approved visiting lists, Discipline Hearing Officer Packets, and Inmate Requests to Staff ("cop-outs"[3]). See Program Statement 5800.17, p. 5 & Appendix A.[4]

12. An inmate has the option to look at and make copies of the majority of his Central File materials. Id. at page 10; see also 28 C.F.R. § 513.40. This procedure is not required by either the Freedom of Information Act or Privacy Act, but is in accordance with sound correctional practices. See Program Statement 5800.17, at p. 10. Only FOIA exempt materials are unavailable for this local review. Id. at 12.

[3] Prison slang for an "Inmate Request to Staff" Form, BP-A148.055. An inmate can use this form to ask a staff member about any aspect of his or her imprisonment. It is a less formal way for inmates to obtain information than the Administrative Remedy Program.
[4] In addition to the Central File, records concerning inmate transfers and designations to institutions and sentence computation are sometimes located at the BOP's Designation and Sentence Computation Center (DSCC) in Grand Prairie, Texas. Sometimes, DSCC decision are reflected only in SENTRY transactions. In those cases, the BOP releases the SENTRY record.

The materials are paintained in a section of the central file that is called the "Privacy Folder."

13. The BOP's policy on what is withheld from inmate access to the central file favors transparency. "Discipline records, such as Unit Discipline Committee (UDC) and Discipline Hearing Officer (DHO) packets (including the UDC/DHO report, incident report, notice of hearing, list of inmate rights at UDC/DHO hearing, notice of placement in Administrative Detention, and investigative memoranda), shall be maintained together in the Privacy Folder only if a portion of an investigation or other discipline record contains non-disclosable materials. Copies of all releasable documents shall be placed together in the disclosable section of the Inmate Central File." Program Statement 1351.05, Release of Information, P.15 (emphasis added) (available on www.bop.gov).

14. An inmate's central file is generally maintained at the inmate's current institution. The files are stored alphabetically by inmate name in secure fireproof cabinets in the unit team offices of the housing unit where the inmate lives. The BOP staff who have access to these files are the unit manager, the case manager, the correctional counselor, and the unit secretary. During all times relevant to this declaration, Mr. Petrucelli has been housed at FCI Allenwood in White Deer, PA.

8

## Mr. Petrucelli's Second Amended Complaint

15. Mr. Petrucelli alleges that the FOIA exemptions were applied improperly, and he states that he feels that he was unjustly denied records. Dkt. # 14, p. 2. The latter allegation is liberally construed as a challenge to the adequacy of the BOP searches.

## Search and Processing

### *FCI Manchester Matters, 2018-06810 (Exh. A)*

16. The NERO received the FCI Manchester Matters request on 15 August 2018 and on the same date forwarded a request for documents to FCI Allenwood and FCI Manchester. In the request, Mr. Petrucelli asked for "[a]ny and all information about himself where he and some employees of the DOJ could be mixed up in an investigation." Exh. A, p. 2. Mr. Petrucelli specifically stated that he was housed in Manchester, Kentucky, on or about 2010-2012 where he had difficulty with staff and believed he was being targeted. Id. Within those parameters, Mr. Petrucelli asked for: (1) information concerning a charge that he had a weapon in his cell and was given extra duty, (2) information concerning his family's contact with the BOP's Office of Internal Affairs (OIA), (3) records concerning a complaint he filed that resulting a meeting with SIS and a transfer, and (4) records of steps he took pursuant to BOP Program Statement 1210.21, Boards of Inquiry and Inquiry Teams (3/9/2000). Id.

9

17. This request was assigned to and processed by another NERO processor who no longer works in the NERO FOIA department; however, I have access to all the records concerning searches she conducted through the BOP's FOIA database. On 15 August 2018, she received a response from the Warden's Secretary at FCI Manchester that indicated there were no responsive records located at FCI Manchester. On 27 August 2018, she received a response from the FCI Allenwood case manager who reported no records were located in the Central File. The case manager determined Mr. Petrucelli was never sanctioned by the unit discipline committee or the disciplinary hearing officer. On 29 August 2018, an additional request was made to search for records in the SIS Department of FCI Manchester and to the BOP's Office of Internal Affairs (OIA) in Washington, D.C. A "no records" response was received from OIA on 29 August 2018. A no records response was received on 5 September 2018 from FCI Manchester. The SIS department responded to the email search query by reporting that a steel rod was found in Mr. Petrucelli's locker on 12 February 2012, but no incident report was written, and Mr. Petrucelli was never charged with possession of a weapon. At this point, the BOP had searched all areas reasonably likely to render records responsive to Mr. Petrucelli's request concerning the FCI Manchester Matters. No other areas remained to be searched that were reasonably likely to render

10

responsive documents.  A final determination letter was sent to Mr. Petrucelli on 5

September 2018.  Id. at p. 3.

*The 2002 New York Fight, 2018-06812 (Exh. B).*

18. The Northeast Regional Office received Mr. Petrucelli's FOIA request on 15

August 2018, and on the same date forwarded, via e-mail, a request for documents

to FCI Allenwood.  In the request, Mr. Petrucelli asked for "[a]ny and all

information pertaining to himself being involved in an altercation with another

inmate while being housed at MCC New York in 2002."  Exh. B, p. 1-2.  Petrucelli

stated that he had "filed some internal and administrative appeals with the

incident[] while in the S.H.U. at M.C.C. New York."  Id.

19. On 20 August 2018, I received a no records response from the case manager at FCI

Allenwood.  The case manager indicated that Mr. Petrucelli was sanctioned in

2002 for "assault without serious injury."  The case manager conducted a search of

Mr. Petrucelli's central file and was unable to locate the incident report.

20. On 6 December 2018, I emailed a request for documents to MCC New York.  I

received no response.  On 5 April 2019, NERO FOIA Attorney John Wallace

emailed MCC New York an additional request for documents.  On the same date,

an attorney from MCC New York responded that they were searching institution

files and archives for responsive records.  The attorney at MCC New York advised

11

that the incident report regarding the fight and Petrucelli's administrative appeal[5] of the incident should be in Mr. Petrucelli's central file. On 9 April 2019, I emailed the unit secretary at FCI Allenwood to ask her to conduct an additional search of the central file for the 2002 incident report. I also asked her to search Mr. Petrucelli's cop-outs to staff to see if he had made any requests regarding the incident. On 9 April 2019, the unit secretary conducted a search of Mr. Petrucelli's central file and located the 2002 incident report and forwarded it to me. The secretary reported there were no cop-outs in the file that referenced the 2002 incident.

21. On 9 April 2019, I also emailed the NERO Administrative Remedy section to see if they could locate the BP-10 Mr. Petrucelli references in his request and is reflected in SENTRY. On 10 April 2019, a NERO legal assistant found the BP-10 and forwarded it to me for processing.

22. On 22 April 2019, Attorney Wallace wrote to the MCC New York Attorney and reported that copies of the incident report and the BP-10 had been recovered. Wallace stated that anything else that might be responsive would be irregular or exotic, *i.e.,* outside normal systems-of-records expectations. Wallace asked for a

---

[5] The BOP's formal administrative remedy program for inmates permits initial filing at the institution (a BP-9 Form), an appeal at the regional level (BP-10), and an appeal to the Central Office via Form BP-11. The filings are almost uniformly referred to by the form label. The existence of Petrucelli's BP-10 was found through a SENTRY search.

status report on the New York search.  On 5 May 2019, in response to a telephone

query, MCC New York reported that a search of local SIS files recovered nothing

responsive to the request.  Attorney Wallace ask MCC New York to stop their

searches because it was not reasonably likely that an archive search would render

responsive document.  The "internal" appeal, if it exists, would have been

recovered during FCI Allenwood's 9 April 2019 search of Mr. Petrucelli's cop-

outs.

23. At this point, the BOP had searched all areas reasonably likely to render records

responsive to Mr. Petrucelli's request concerning the 2002 New York Fight.  No

other areas remained to be searched that were reasonably likely to render

responsive documents, so I began processing the records on 7 May 2019.  On 9

May 2019 five pages of responsive records were released to Petrucelli.

*The Canaan to Manchester Transfer, 2018-06820 (Exh. C)*

24. The Northeast Regional Office received Mr. Petrucelli's FOIA request regarding

this transfer on 13 August 2018.  Exh. C, p 1.  On the same date, I forwarded, via

e-mail, a request for documents to FCI Allenwood.  In the request, Mr. Petrucelli

asked for any and all information pertaining to his transfer to FCI Manchester.

Exh. C, pp. 1-2.  Mr. Petrucelli details his move from USP Canaan, the multiple

holdover locations he stayed on the transfer, the travel conditions, and a loss of his

personal property.  Id.

25. Mr. Petrucelli's case manager at FCI Allenwood conducted a search of Mr. Petrucelli's central file and located one page of responsive records which was forwarded to me for processing on 27 August 2018.

26. On 6 December 2018, I sent a request for documents to the e-mailbox of the DSCC Attorney at Grand Prairie, TX. [6]  On 10 December 2018, a DSCC paralegal located one page of responsive records which was forwarded to me for processing. At this point, the BOP had searched all areas reasonably likely to render records responsive to Mr. Petrucelli's request concerning the Canaan to Manchester Transfer. No other areas remained to be searched that were reasonably likely to render responsive documents, so I began processing the records. The records were mailed to Mr. Petrucelli, and the request was closed on 11 December 2018. Exh. C, p. 3.

*The Manchester to Allenwood Transfer, 2018-06906 (Exh. D)*

27. The Northeast Regional Office received Mr. Petrucelli's FOIA request regarding this transfer on 17 August 2018. Exh. D, p. 1. On the same date, via e-mail, I sent a request for documents to FCI Allenwood. In the request, Mr. Petrucelli asked for records about himself that involved his transfer on or about May 2012. Id. Mr.

---

[6] In addition to the Central File, records concerning inmate transfers and designations to institutions and sentence computation are sometimes located at the BOP's Designation and Sentence Computation Center (DSCC) in Grand Prairie, Texas. Sometimes, DSCC decision are reflected only in SENTRY transactions. In those cases, the BOP releases the SENTRY record.

14

Petrucelli detailed his experience, to include his belief that he was being transferred to FCI McKean and that he lost property. Id. at pp. 1-2.

28. On 27 August 2018, the case manager at FCI Allenwood conducted a search of Mr. Petrucelli's central file. No record related to the transfer from FCI Manchester to FCI Allewood was located in the central file. On 20 September 2018, I sent a request for documents to the DSCC Attorney mailbox. On 27 September 2018, a DSCC paralegal located one responsive record, which was forwarded to me for processing. On 5 October 2018, I emailed the paralegal for additional information as to why Mr. Petrucelli's transfer destination was changed from FCI McKean to FCI Allenwood. On 10 December 2018, I received a response from the DSCC paralegal that stated that Mr. Petrucelli's transfer destination was changed due to Petrucelli's CIMs assignment of separation. See 28 C.F.R. § 542.72(f) (concerning separation information). The paralegal advised me that certain SENTRY transactions would render separation information; however, I did not search further in this regard. It was my belief that the separation records were beyond the scope of the request and therefore nonresponsive. At this point, I believed that the BOP had searched all areas reasonably likely to render records responsive to Mr. Petrucelli's request concerning the Manchester to Allenwood Transfer. It appeared that no other areas remained to be searched that were reasonably likely to render responsive documents, so I processed the records. BOP Attorney John Wallace

15

approved the release on 25 October 2018. The release was mailed to Mr. Petrucelli and the request was closed on 29 October 2018. Id. at p. 3.

29. Nevertheless, on 13 February 2019, I was contacted via email by an attorney for the OIP. The attorney reported that Mr. Petrucelli was challenging the search as well as the exemptions applied to this request. Exh. D, pp. 5-9. At that time, I reviewed the request to determine if an additional search should be conducted. On the same date, 13 February 2019, I spoke to the records department at FCI Allenwood via telephone. The records department had access the SENTRY separation records I mention in the above paragraph. They produced a three-page SENTRY record concerning CIM Clearance and Separatee Data[7] that I collected. I also contacted Mr. Petrucelli's unit manager to request an additional search of the central file be conducted for responsive transfer records that may have been missed in the initial search. The Unit Manager conducted the search of the central file and located two property sheets. The first property sheet, which was completed on 31 July 2012, shows that Mr. Petrucelli noted missing property. The notation was lined through and initialed by staff. The second property sheet is dated 16 August 2012; Mr. Petrucelli does not mention any missing property.

---

[7] This highly-sensitive document shows the location of an inmate's separatees. "CIM" refers to central inmate monitoring. The document is maintained the privacy folder (also called the FOIA-exempt section) of an inmates central file. P.S. 5800.17, App'x A, p. 16. SENTRY access to this document is on a need-to-know basis.

16

30. On 26 March 2019, the request was remanded for processing of the additional documents. Exh. D, pp. 10-11. I processed the additional documents and assigned the request for review on 29 March 2019. The request was approved and the records were mailed to Mr. Petrucelli on 2 April 2019. Id. at pp. 12-13

*The 2011 FOIA Denial (2018-07118) (Exh. E)*

31. The Northeast Regional Office received Mr. Petrucelli's FOIA request on 27 August 2018, and on the same date I conducted a search of 2011 FOIA requests using Mr. Petrucelli's name and register number as my search criteria. In the request, Mr. Petrucelli asked for a copy of the FOIA determination letter pertaining to a copy of an administrative detention order from 2002. Exh. E. On 30 August 2018, I located the requested record in the FOIA database I use daily. At this point, the BOP had searched all areas reasonably likely to render records responsive to Mr. Petrucelli's request concerning the 2011 FOIA Denial Letter. No other areas remained to be searched that were reasonably likely to render responsive documents, so I began processing the record. The request was approved and records sent to Mr. Petrucelli on 31 August 2018. Id. at p. 2.

*The 2002 Intake Screening (2018-07116) (Exh. F)*

32. The Northeast Regional Office received Mr. Petrucelli's FOIA request on 27 August 2018, and on the same date forwarded, via e-mail, a request for documents to FCI Allenwood. In the request, Mr. Petrucelli asked for a copy of the intake

17

screening completed by a senior officer specialist in 2002. Exh. F, p. 1. This request was originally assigned to another processor. On 7 September 2018, a case manager at FCI Allenwood forwarded two pages of responsive records which were uploaded to the FOIA database by the processor.

33. On 5 April 2019, I re-assigned the case to myself and conducted a new search. I contacted Mr. Petrucelli's correctional counselor at FCI Allenwood, and I asked the counselor to conduct a second search of the central file for any records regarding the 2002 intake screening. The counselor conducted the search of the central file and located one page of additional records that I considered responsive to the request. At this point, the BOP had searched all areas reasonably likely to render records responsive to Mr. Petrucelli's request concerning the 2002 Intake Screening. No other areas remained to be searched that were reasonably likely to render responsive documents. I processed the three pages of records and referred the matter to Attorney Wallace for secondary review on 5 April 2019. On 5 April 2019, the release was approved and mailed to Mr. Petrucelli. Id. at pp. 2-3.

*The 2002 Brooklyn Cell Assignment, 2018-07115 (Exh. G).*

34. NERO received this FOIA request on 30 August 2018 (see Exh G, p. 1), and on the same date I reviewed FOIA# 2017-00843, which Mr. Petrucelli's mentions regarding the Brooklyn Cell Assignment. Id. I then conducted a SENTRY search of Mr. Petrucelli's history housing quarters to determine which records could

18

possibly be missing from FOIA # 2017-00843. In the request, Mr. Petrucelli asked

for missing SHU records from two or three days in 2002 at MDC Brooklyn.

35. On 30 August 2018, I sent a request for documents to FCI Allenwood to conduct a

search of the central file for the SHU records I thought might be missing. On 6

September 2018, I received two pages of records from an FCI Allenwood case

manager. At this point, the BOP had searched all areas reasonably likely to render

records responsive to Mr. Petrucelli's request concerning the Brooklyn Cell

Assignment. No other areas remained to be searched that were reasonably likely to

render responsive documents, so I processed the records. Attorney Wallace

approved the release, and the records were mailed to Mr. Petrucelli on 24

September 2018.

JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

36. The records responsive to Mr. Petrucelli's request were processed to achieve

maximum disclosure consistent with FOIA. Every effort was made to provide Mr.

Petrucelli with all reasonably segregable nonexempt information in the responsive

records. No reasonably segregable nonexempt portions were withheld from Mr.

Petrucelli. Further description of the information withheld, beyond what is

described in this declaration, could identify the actual exempt information the BOP

has protected.

## Exemption (b)(6) Regarding Privacy

37. The BOP relied upon exemption (b)(6), which exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . . . " 5 U.S.C. § 552(b)(6).[8] All information that applies to a particular person falls within the scope of Exemption 6. Subpart (b)(6) was invoked as authority for the redaction or withholding of the identifiers of third parties mentioned in the agency records released to Mr. Petrucelli. Each time exemption (b)(6) was used, the privacy interest of the third-party individual was weighed against the public's interest, which is an interest in understanding the operations of the BOP. Mr. Petrucelli has not, at any place in his Second Amended Complaint, identify a specific public interest.

## The Exemption (b)(7) Threshold

38. The BOP properly employed Exemption 7 in response to Mr. Petrucelli's FOIA requests. Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure would cause an enumerated harm. 5 U.S.C. § 552(b)(7). In order to withhold documents under

---

[8] It is the practice of the BOP to assert Exemption 6 with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

Exemption 7, the agency must—as a preliminary matter—make a threshold

showing demonstrating that the records were compiled for a law enforcement

purpose. To show that documents were compiled for law enforcement purposes,

the BOP need only establish a rational nexus between a record and one of the

agency's law enforcement duties.

39. The BOP's primary responsibility is to protect all persons charged with or

convicted of offenses against the United States, as well as the law enforcement

detention staff and the community. The nature and contents of the Inmate Central

Records System show that the requested records relate to this law enforcement

purpose. 18 U.S.C. § 4042. Included are the highly-sensitive and frequently

sealed presentence investigations reports; the sentencing judge's statement of

reasons; other sentence and detainer data; security classification materials;

background check materials (including NCIC reports) for visitors; conduct, work

and quarters reports; release processing; and general correspondence. See Program

Statement 5800.17, p. 5. The fact that some of these records are mundane does not

mean they lack a rational nexus to the BOP's law enforcement mission.

40. The documents from Mr. Petrucelli's Central File were generated as part of BOP's

law enforcement mission of protecting inmates, staff, and the community. There is

a direct relationship between the responsive records and the BOP's duty to ensure

the safety of inmates, staff, and the community and its professional decisions as to

how to protect inmates.  Accordingly, the responsive records at issue in this case
were compiled for law enforcement purposes within the scope of Exemption 7.

## Exemption (b)(7)(C) Concerning Privacy

41. Exemption (b)(7)(C) exempts from disclosure "records or information compiled
for law enforcement purposes [when disclosure] could reasonably be expected to
constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).
When determining whether redacting or withholding records under Exemption
7(C) is proper, I weigh the privacy interests at stake against the public interest in
disclosure of the information.  To overcome a legitimate privacy interest, a
requestor must:  (1) demonstrate the public interest is a significant one and more
than having the information for its own sake; and, (2) show the information is
likely to advance that interest.  Exemption 7(C)'s privacy protections extend to
personally identifiable information that appears in law enforcement records.

42. Exemption 7(C) protects the privacy interests of all individuals mentioned in law
enforcement records, including—but not limited to—investigators, suspects,
witnesses, and bystanders.  Exemption 7(C) authorizes the withholding of the
photographs, names, [9] and addresses of private individuals appearing in files unless

---

[9] A revelation of an individual's name, especially an individual with a passing or tangential
relationship to the FOIA request, would merely subject that individual to scrutiny while failing to
shed any light on how the BOP carries out its mission.

release is necessary in order to confirm or refute compelling evidence that the
agency is engaged in illegal activity.

43.In order for the release of records to serve a public interest, the information must
shed light on an agency's performance of its statutory duties. Names, likenesses,
and other identifying information of most individuals rarely contribute to this
public interest or knowledge of how an agency operates. If release of the records
serve the public interest, a requester must also demonstrate the public interest is
both significant and compelling enough to overcome legitimate privacy interests.
If illegal or improper activities are alleged, a requester must produce meaningful
evidence—more than a bare suspicion—that would cause a reasonable person to
believe the government had engaged in impropriety.

44.Mr. Petrucelli does not address any potential public interest at stake in his
Second Amended Complaint. Mr. Petrucelli fails to provide any justification
for invading the privacy interests of law enforcement staff, third-party inmates,
and the citizens who appear in his records. After conducting the privacy
balancing test, I used (b)(6) and (b)(7)(C) to redact third-party staff, inmate, and
citizen names on the five documents addressed in the Vaughn index.

### Exemption (b)(7)(F)

45.Exemption (b)(7)(F) permits the withholding of information obtained for law
enforcement purposes that, if made public, could reasonably be expected to

endanger the life or safety of any individual.  The BOP employs this exemption to
protect staff, inmates, visitors, and any other information that could compromise
the humane, orderly, and efficient operation of a prison.

46. Exemption (b)(7)(F) was used to protect the identities of Mr. Petrucelli's inmate
separatees.  See 28 C.F.R. § 542.72(f) (concerning separation information) and
information on an intake screening form that would, if released, endanger any
inmate in possession of the document.  Exemption (7)(F) permits the protection of
law enforcement information that could reasonably be expected to endanger the
life or safety of any individual.  Disclosure of this information could threaten lives
or the physical safety of these third parties and staff if there is a violent incident in
prison.  Inmates are classified as separatees for various reasons (§ 542.72(f));
however, the bottom line is safety concerns require that they be kept apart.  That is,
they must be housed in different prisons or in housing situations that make physical
contact impossible.  Exemption (b)(7)(F) was used in this manner on document
three at pages five through seven.  Exhibit H (Vaughn Index).

47. The BOP's Intake Screening Form contains information that must, for reasons of
danger to life or physical safety, be redacted pursuant to (b)(7)(F) in all FOIA
releases.  The intake screening process requires an interviewer to ask the inmate a
series of questions concerning physical safety.  They read:

> 1. DO YOU KNOW OF ANY REASON YOU SHOULD NOT BE
> PLACED IN GENERAL POPULATION?

2.  HAVE YOU ASSISTED LAW ENFORCEMENT AGENTS IN ANY WAY?

3. ARE YOU A CIM CASE?

4.  HAVE YOU TESTIFIED AGAINST ANYONE IN COURT?

5.  ARE YOU A MEMBER/ASSOCIATE OF ANY GANG?

> 6a. HAVE YOU EVER BEEN SEXUALLY ASSAULTED?

> 6b. HAVE YOU RECENTLY BEEN SEXUALLY ASSAULTED?

The form contemplates that the interviewer will check "yes" or "no" for each question.  The BOP redacts the answers to questions 2 & 4-6B in all cases, regardless of an inmate's response.  The BOP does this because the information is incendiary:  informants ("rats" in prison slang), certain gang members, and weak inmates face threats of physical harm in prisons.  An admission of sexual victimhood strongly suggests weakness in prison culture.[10]  If an official record shows—for example—that an inmate took certain actions or committed certain crimes, that information would endanger any inmate on any BOP prison compound.  The designated intake screening form responses must be handled in

---

[10] Information that shows an inmate is a sex offender is also extremely dangerous and is protected under (b)(7)(F).  Because this information could endanger lives or physical safety, the BOP handles Walsh Act information in the same way:  it must be redacted without regard to whether the inmate has Walsh Act offense history.

25

the same way as PSRs[11] because predatory inmates will use this information to

extort, harass, or even justify—under the primitive rules of prison culture—

assaulting or killing another inmate.  Exemption 7(F) was used in this manner on

document four at page two.  Exhibit H.

## SEGREGABILITY

48. In this matter, the BOP reviewed all of the responsive pages for segregability.

That is, after the three apposite exemptions were applied, the remainder was

examined to determine whether any reasonably segregable portions of the record

could be released.  No page was withheld in full.  It is understood that non-exempt

information must be released unless that information is inextricably intertwined

with exempt portions.  The BOP applied minimal redactions to protect the

identities of line-level staff and third-party citizens.  Minimal redactions were also

used to protect the lives and physical safety of third-party inmates and Mr.

Petrucelli himself.

## DISCRETIONARY RELEASE

49. Finally, I carefully reviewed Former Attorney General Holder's memo dated 19

March 2009, which encourages agencies to make discretionary disclosures and

directs agencies to segregate and release nonexempt information.  The privacy and

safety exemptions I applied are not amenable to this treatment.  I determined no

---

[11] See Scholz v. Samuels, 72 F. Supp. 3d 81, 89 (D.D.C. 2014).

additional reasonably segregable information exists which can be released to the Mr. Petrucelli.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.  I also declare all exhibits are true and accurate copies of records maintained by the Federal Bureau of Prisons.

Dated this 10 day of May 2019.


Lee-Anne Eichensehr
Government Information Specialist
USP Lewisburg

27